STATE of Wisconsin, Plaintiff-Respondent,

v.

Janice J. KUHN, Defendant-Appellant.

Court of Appeals

*No. 92–0592–CR. Submitted on briefs April 13, 1993.—Decided July 27, 1993.*

(Also reported in — N.W.2d —.)

428

For the defendant-appellant the cause was submitted on the briefs of *C. Virginia Finn* of Milwaukee.

For the plaintiff-respondent the cause was submitted on the briefs of *James E. Doyle*, attorney general, with *William C. Wolford*, assistant attorney general, of Madison.

429

SULLIVAN, J. Janice J. Kuhn appeals from a judgment of conviction for four counts of theft by bailee, in violation of sec. 943.20(1)(b) and (3)(c), Stats. Kuhn, the owner of an auction gallery, was charged with theft of auction proceeds, which she held as bailee on behalf of the owner's of the auctioned property. Kuhn presents the following issues: (1) that she could not be charged as an individual because it was a corporation, the auction gallery, and not Kuhn as an individual, who dealt with the victims; (2) that she could not be charged under sec. 943.20(1)(b), Stats., because her non-payment on consignors' accounts was not a criminal offense, but rather a mere contractual default between debtor and creditor; (3) that the State failed to prove both the intent element of the crime and that she converted the money to her own use or the use of a person other than the owner of the money; (4) that the trial court erroneously admitted certain exhibits into evidence; and (5) that she should be granted a new trial in the interests of justice. We reject each of Kuhn's claims, in turn, and affirm the conviction.

Kuhn purchased Milwaukee Auction Galleries, Ltd. (MAG), a Wisconsin corporation, in 1977. At all pertinent times, Kuhn was MAG's president, treasurer, sole director and sole shareholder. Her children acted as corporate vice-presidents and secretary. Kuhn also performed appraisal work for MAG, for which she received a salary. MAG was in the business of selling consigned property at auction. It received a commission ranging from 10% to 25% of the sales price. It received an additional 10% commission paid by the buyer. MAG had two bank accounts"one was denominated a "trust account," into which gross sales proceeds were deposited, the other was a general operating account. Periodically, gross income was computed and

an average commission percentage was withdrawn from the trust account and deposited into the operating account, from which business expenses were to be paid.

Under its typical consignment contract, MAG was required to remit net sales proceeds to consignors within thirty-five days of the auction sale.[1] Sometime during 1988, however, MAG became delinquent in its payments to consignors. Several consignors received checks from MAG, only to have the checks returned to them by the bank due to insufficient funds in MAG's account, and others received no checks at all. Kuhn admitted that accounts showed deficiencies, and that MAG had a "leak in the bucket," but claimed that she couldn't find the leak.

Following a bench trial, Kuhn was convicted of four counts of theft in violation of sec. 943.20(1)(b), which provides:

> Whoever does any of the following may be penalized as provided in sub. (3):
> . . . .
> (b) By virtue of his office, business or employment, or as trustee or bailee, having possession or custody of money or of a negotiable security, instrument, paper or other negotiable writing of another, intentionally uses, transfers, conceals, or retains possession of such money, security, instrument, paper or writing without the owner's consent, contrary to his authority, and with intent to convert to his own use or to the use of any other person except the owner. A refusal to deliver any money or a nego-

---

[1] The printed form of consignment agreement contained the following settlement provision: "Settlement checks will be mailed to you within thirty-five days after the last sale date of the session, along with the post-sale voucher showing the successful bid price of each item and the net amount due to you."

tiable security, instrument, paper or other negotiable writing, which is in his possession or custody by virtue of his office, business or employment, or as trustee or bailee, upon demand of the person entitled to receive it, or as required by law, is prima facie evidence of an intent to convert to his own use within the meaning of this paragraph.

Kuhn's first issue on appeal is that she cannot be charged as an individual because it was MAG, and not Kuhn as an individual, who dealt with the consignors. Kuhn argues that the trial court erred in not explaining why it "pierced the corporate veil" and held her personally at fault. In support of her position, Kuhn cites numerous *civil* cases that explain that, in general, shareholders are not personally liable for obligations of the corporation. *See e.g., Benjamin Plumbing, Inc. v. Barnes*, 162 Wis. 2d 837, 849–50, 470 N.W.2d 888, 893 (1991).

Individual officers are, however, personally responsible for *criminal acts* committed in the name of the corporation. *State v. Lunz*, 86 Wis. 2d 695, 707, 273 N.W.2d 767, 773 (1979). "Since a corporation is an individual existing only in contemplation of the law, its criminal acts are those of its officers and agents; and thus persons in control of a corporation and who knowingly acquiesce to the corporation's [criminal act] may be personally prosecuted for the criminal act." *Id.*

Kuhn's next argument is that she could not be charged under sec. 943.20(1)(b), Stats., because her non-payment on consignors' accounts was not a criminal offense, but rather a mere contractual default between debtor and creditor. She contends that she was erroneously considered a bailee under the statute, when, in fact, she doesn't meet the definition of bailee

under the Uniform Commercial Code (U.C.C.), as contained in sec. 407.102(1), Stats.[2] That statute provides that the definitions contained in the statute apply to chapter 407, which is the chapter within the U.C.C. that governs documents of title. The definition of "bailee" in sec. 407.102(1), however, is irrelevant to the meaning of the word as used in the criminal theft statute.

■

"Where goods are consigned to another with the understanding that the consignee will either sell the property for the consignor and remit to him the price or, if he does not sell the property, return it to the consignor, the transaction is not a sale, but a bailment for sale." 8 AM. JUR. 2D *Bailments* § 45 (1980); 8 C.J.S. *Bailments* § 11 (1988) ("transaction is a bailment or an agency to sell on consignment"). It is this definition of the word bailment that should be used to determine whether an individual fits the definition of a "bailee" as used in sec. 943.20(1)(b), Stats. *See State v. Dohn*, 216 Wis. 367, 370–71, 257 N.W. 21, 22–23 (1934).

MAG's contracts with the consignors fit this definition of bailment. MAG agreed to sell the consigned property and remit the sale proceeds, less the commission, to the consignors within thirty-five days of the sale date. In the event that the property was not sold, MAG agreed to return the unsold property to its owner. MAG was a "bailee" under sec. 943.20(1)(b), Stats., and Kuhn could be charged as a bailee for criminal acts committed in the name of that corporation.

---

[2] Section 407.102(1), Stats., provides in relevant part: " *In this chapter* . . . (a) 'Bailee' means the person who by a warehouse receipt, bill of lading or other document of title acknowledges possession of goods and contracts to deliver them." (Emphasis added.)

Kuhn's next issue on appeal is that the facts do not establish her guilt with regard to the intent element of the crime. In a criminal trial to a court or jury, we will reverse only when the evidence, considered most favorably to the state, is so insufficient in probative value that, as a matter of law, no trier of fact acting reasonably could be convinced of guilt to the required degree of certitude, which the law defines as beyond a reasonable doubt. *State v. Oppermann,* 156 Wis. 2d 241, 246, 456 N.W.2d 625, 627–28 (Ct. App. 1990). Where more than one reasonable inference may be drawn from a set of circumstances, an appellate court is required to accept the inference drawn by the trier of fact. *State v. Poellinger,* 153 Wis. 2d 493, 506–07, 451 N.W.2d 752, 757 (1990).

Under sec. 943.20(1)(b), Stats., the State must prove that a defendant "intentionally uses, transfers, conceals, or retains possession of such money . . . without the owner's consent, contrary to his authority, and with intent to convert to his own use or to the use of any other person except the owner."

There is sufficient evidence in this case to prove that Kuhn acted with the necessary intent under the statute. According to the testimony of Kuhn's employees, MAG began experiencing financial difficulties some time during the mid-1980's. Commissions generated by the auctions were no longer sufficient to cover the overhead costs of running the business. To keep the business running, money above and beyond MAG's commissions was used to pay overhead costs. By necessity, this meant that money held by MAG as bailee on behalf on the consignors was spent for business purposes. Payments to consignors became delinquent, and

often, only those consignors who complained the loudest received their money from MAG.

Decisions on which consignors would get paid were made solely by Kuhn. Although her employees would often make out the checks, Kuhn was the only person authorized to sign corporate checks. While the bookkeeping system was set up so that auction proceeds were to be deposited in the "trust account," and only commissions were to be deducted and deposited in the general account, this system began to break down as money became more scarce. On occasion, Kuhn would direct her employees to bypass the "trust account" and deposit total auction sale proceeds into the general account to cover business expenses. The employees testified that the system of who received payment and the vicious circle of taking from Peter to pay Paul was done, not only with the full knowledge of Kuhn, but under her sole direction and control. Thus, the evidence was sufficient to prove that Kuhn acted with the requisite intent.

Kuhn also argues that the State did not prove that she converted the money to her own use or the use of a person other than the owner of the money. She contends that the money was "owned" by MAG, as it was commingled with corporate funds and had lost its "individual identity."

We have already explained that MAG held the property as a bailee, and not as an "owner." When MAG sold the consignors' property and received the proceeds, the proceeds became the subject of the bailment for sale. *See Dohn,* 216 Wis. at 371, 257 N.W. at 22. Thus, when the State proved that MAG used those proceeds to fund its financially troubled operation, the State had proved that the bailment was converted to the use someone other than the owner of the money.

435

The evidence was sufficient to show that Kuhn, as sole shareholder of the corporation, was converting the funds to her own use as well.

Kuhn contends that the admission of several exhibits into evidence was an erroneous exercise of discretion, that it denied her due process of law because it was a surprise and fundamentally unfair, and that it violated her rights to confrontation and cross examination guaranteed by U.S. Const. amends. V and VI, and Wis. Const. art. I, secs. 1, 7 and 8.

The trial court initially excluded the exhibits. After the defense had rested, however, and apparently under a mistaken impression as to its previous ruling, the court admitted the exhibits.[3] The State does not argue that the admission of the exhibits was proper, but rather, that any resulting error was harmless because there was no reasonable possibility that the error affected the outcome of the trial. *See State v. Dyess*, 124 Wis. 2d 525, 543, 370 N.W.2d 222, 231–32 (1985). We agree that any error was harmless.

The exhibits involved concern proxy bidding and reserve pricing, which are complicated concepts that, Kuhn argues, she could have explained if given the opportunity. The State argues that these were mere collateral issues upon which the State's case did not depend. The State points out that it had not included any reference to the exhibits in its closing argument or trial brief. We agree with the State's reasoning and conclude that any error with regard to the admission of the exhibits was harmless.

---

[3] In fairness to the trial court, we note that the State introduced numerous exhibits and, due to a lengthy continuance, one and one-half months passed between the two contradictory rulings.

Kuhn's next argument on appeal is that she was denied effective assistance of counsel because her trial counsel failed to argue that she was not a "bailee" under the U.C.C., and failed to adequately supervise the drafting of a stipulation. We reject this argument.

We apply a two-part test in determining whether a defendant received effective assistance of counsel; first, whether counsel's performance was deficient, and second, whether counsel's deficient performance prejudiced the defendant. *State v. Johnson*, 133 Wis. 2d 207, 216–17, 395 N.W.2d 176, 181 (1986). As we have already explained, Kuhn's argument that she was not a bailee under the U.C.C. is meritless, and thus, counsel was justified in not raising the issue. Kuhn has failed, therefore, to meet her burden of proving that her attorney's conduct was deficient in that regard. *See id.*

Kuhn also claims that her attorney failed to adequately supervise the drafting of a stipulation, which described the contractual relationship that Kuhn had with each consignor and certain undisputed facts such as non-payment of funds to the consignors. Kuhn argues that trial counsel allowed the stipulation to contain erroneous statements of facts. First, Kuhn claims that the stipulation erroneously stated that the consignors did not give consent to anyone to retain possession of their proceeds. Kuhn argues that this was not a correct statement because, to quote Kuhn, "the consignors granted MAG the right to possess, and presumably to use," the proceeds for 35 days after the sale. This is simply not true, and the attorney cannot be faulted for not pursuing this claim. The contract stated that MAG had thirty-five days in which to turn over the money to the consignors. The contract does not state that MAG could use the money for its own purposes

until the thirty-five days had elapsed. Kuhn's attorney's conduct was not deficient in that regard.

Kuhn argues that a second factual error contained in the stipulation was its false characterization of the "[c]opies of consignors' vouchers" as "itemizing proceeds of the sale of . . . property." Kuhn points out that the lists really only included the high bid at the auction, which may or may not have been collected from the bidder.

Because we conclude that Kuhn could not have been prejudiced by the alleged error, we need not address whether counsel's performance was deficient in not objecting to the stipulation's characterization of the vouchers. *See Strickland v. Washington*, 466 U.S. 668, 697 (1984). Kuhn herself testified that money was owed to several estates and had not been paid. Kuhn's argument that the auction lists did not accurately reflect the true proceeds due to the estates goes only to the *amount* that was owed to the estates"an issue that was not crucial to the State's case. The exact amount that MAG owed to each of the victims was included in the stipulation and Kuhn does not argue that these amounts are incorrect. Kuhn suffered no prejudice from the alleged error in the stipulation. Thus, we reject Kuhn's claim that she was denied effective assistance of counsel.

Finally, Kuhn argues that this court should grant a discretionary reversal and order a new trial because the real controversy has not been fully tried and because the interests of justice require it. *See* sec. 752.35, Stats. Kuhn's appellate brief focuses on evidence that one of her employees, a bookkeeper, had been accused of embezzlement by Kuhn in the past. Kuhn argues that this fact must have escaped the attention of the trial judge. The issue, however, was

addressed both during Kuhn's cross-examination of the witness, and during Kuhn's own testimony. Kuhn's claim that because the trial judge did not comment on the information, he didn't hear it, is unsupported.

As further evidence of such embezzlement by the bookkeeper, Kuhn includes in the appendix of her appellate brief copies of the employees payroll checks, which allegedly show that the employee changed the amounts on the payroll checks from $337.71 to $637.71. Kuhn also alleges, for the first time on appeal, that the bookkeeper also deposited MAG funds directly into her own bank account. Included in the appendix of her appellate brief are fourteen instances where deposit slips indicating certain cash deposits to her personal account at approximately the same time she made deposits for MAG. Kuhn's appendix also contains evidence that on February 20, 1992, long after Kuhn's trial, Kuhn presented three payroll checks dated in June, July and August, 1988 to the Brown Deer Police Department and stated her opinion that they had been altered. On April 22, 1992 the Police Department transmitted the checks to the State Department of Justice Regional Crime Laboratory for further investigation.

Kuhn asks this court to order a new trial in the interest of justice based on this evidence. She contends that it indicates an apparent miscarriage of justice and a retrial under optimum circumstances will produce a different result. *See State v. Machner,* 92 Wis. 2d 797, 305–06, 285 N.W.2d 905, 909 (Ct. App. 1979). None of the evidence that Kuhn urges us to consider, however, is part of the appellate record. We are limited by the record before us and cannot consider the extraneous material included in Kuhn's appendix. *See State v.*

*Aderhold*, 91 Wis. 2d 306, 314, 284 N.W.2d 108, 112 (Ct. App. 1979). Therefore, we deny Kuhn's request for a new trial.

Thus, we conclude that Kuhn was properly charged under sec. 943.20(1)(b), Stats., and that the State has proven both the intent and conversion elements of the crime. We also conclude that any error that resulted from the admission of certain exhibits was harmless and we reject Kuhn's request for a new trial.

*By the Court.*—Judgment affirmed.