STATE of Wisconsin, Plaintiff-Respondent,

v.

Robert FLYNN, Defendant-Appellant.†

Court of Appeals

*Nos. 93–2532–CR, 94–0425–CR. Submitted on briefs October 5, 1994.—Decided December 6, 1994.*

(Also reported in 527 N.W.2d 343.)

†Petition to review denied.

31

36

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Robert L. Flynn, pro se*.

On behalf of the plaintiff-respondent, the cause was submitted on the briefs of *James E. Doyle*, attorney general, and *Mary E. Burke*, assistant attorney general.

Before Sullivan, Fine and Schudson, JJ.

FINE, J. Robert L. Flynn appeals *pro se* from a judgment entered on a jury verdict convicting him of two counts of armed robbery, *see* § 943.32(1)(a), STATS., and from the trial court's orders denying his motion for post-conviction relief.[1] We affirm.

Flynn was convicted of the armed robbery of two gas stations in the early morning hours of February 7, 1992. His allegations of trial-court error focus on the trial court's determination that he was arrested lawfully, and on errors that he contended occurred during the trial. They are asserted in eleven separately numbered main arguments. We discuss the ones he has briefed in the order that he has presented them to us.[2]

1. *Police entry into Flynn's home.*

An automobile registered at a West Windlake Street address was implicated in one of the robberies. Police officers converged on the residence, where they

---

[1] Although one judgment of conviction is involved, there are two separate appellate files because Flynn had attempted to appeal the denial of his motion for post-conviction relief before entry of the applicable orders. The merits of the appeal are not affected by this procedural complexity.

[2] We will not decide issues that are not, or inadequately, briefed. *See State v. Pettit*, 171 Wis. 2d 627, 646-647, 492 N.W.2d 633, 642 (Ct. App. 1992) (appellate court may decline to address issues that are inadequately briefed; arguments that are not supported by legal authority will not be considered); *W. H. Pugh Coal Co. v. State*, 157 Wis. 2d 620, 634, 460 N.W.2d 787, 792 (Ct. App. 1990) (an appellate court may decline to consider issue that is undeveloped in the briefs or that is not supported by citation to legal authority); *Reiman Assocs. v. R/A Advertising*, 102 Wis. 2d 305, 306 n.1, 306 N.W.2d 292, 294 n.1 (Ct. App. 1981) (issue raised but not briefed or argued is deemed to be abandoned); *see also* § 809.19(1)(e), STATS.

ultimately found Flynn. They did not have either a search warrant or an arrest warrant.

One of the responding officers testified at a pretrial hearing that he knocked on the door of the house on West Windlake Street, that Flynn's wife eventually answered, and that she consented to their entry into her home, which was in the upstairs portion of the two-family residence. According to the officer, they told Mrs. Flynn that they were looking for a white male armed-robbery suspect. The officer testified that Mrs. Flynn said that she owned the car, that she had the only keys, that no one had her permission to drive the car, and that there were no white males in the house. She claimed to be living in the home with only her children and her mother. According to the officer's testimony, Mrs. Flynn also gave them permission to go into the attic, and when they found Flynn there, she told them that she did not know him—commenting that there " 'shouldn't be anyone up there.' "

As the officers were removing Flynn from the attic, he called to his wife: "[D]on't tell the police nothing. Call my attorney." At that point, according to the testimony of the police officers, Mrs. Flynn became "somewhat combative" and "belligerent," and told them to leave. The officers arrested her for disorderly conduct. They took Flynn outside, where he was identified as the robber by one of the victims. He was then arrested.

Mrs. Flynn testified at the suppression hearing. She denied that she consented to the officers' entry into her home and into the attic. The trial court, however, believed the officers' testimony.

Under the applicable standard of review, we uphold the trial court's findings of historical facts

unless those findings are clearly erroneous. *See State v. Schwegler*, 170 Wis. 2d 487, 494, 490 N.W.2d 292, 294 (Ct. App. 1992). We analyze *de novo* the legal issue of whether there was a constitutional violation. *See ibid.* Our analysis is the same whether we apply the Fourth Amendment to the United States Constitution or article 1, section 11 of the Wisconsin Constitution. *See State v. Fry*, 131 Wis. 2d 153, 171–176, 388 N.W.2d 565, 573-575 (1986), *cert. denied*, 479 U.S. 989.

As the trial court recognized in its well-reasoned oral opinion, under the Fourth Amendment, a warrantless entry and search is presumptively unreasonable. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *State v. Boggess*, 115 Wis. 2d 443, 448–449, 340 N.W.2d 516, 520 (1983). "It is equally well settled that one of the specifically established exceptions to the [Fourth Amendment] requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth*, 412 U.S. at 219. The trial court determined that before her husband was discovered in the attic, Mrs. Flynn was fully cooperative and gave the officers permission to do what they did. These historical facts are not clearly erroneous. The trial court then found that Mrs. Flynn's actions constituted consent for the entry and search. This is a finding of constitutional fact because it requires the " 'application of constitutional principles to the [historical] facts as found.' " *See State v. Mazur*, 90 Wis. 2d 293, 309, 280 N.W.2d 194, 201 (1979) (citation omitted). Although we review independently a trial court's findings of constitutional fact, *State v. Woods*, 117 Wis. 2d 701, 715, 345 N.W.2d 457, 465 (1984), *habeas corpus granted on other grounds, Woods v. Clusen*, 605 F. Supp. 890 (E.D. Wis. 1985), *aff'd, Woods v. Clusen*, 794 F.2d 293 (7th

Cir. 1986), we agree that the trial court's findings of historical fact lead ineluctably to the conclusion that Mrs. Flynn gave the officers consent to come into her home and to search the attic.

 2. *Flynn's arrest.*

One of the officers responding to the West Windlake address testified that Flynn matched the description of the armed robber given by one of the victims. The officers took Flynn from the house for an on-the-scene identification. This was prudent and permissible police practice. *See State v. Wilkens*, 159 Wis. 2d 618, 626, 465 N.W.2d 206, 210 (Ct. App. 1990) (police may detain a suspect for a reasonable period of time); *State v. Isham*, 70 Wis. 2d 718, 723–724, 235 N.W.2d 506, 509-510 (1975) (one-on-one identification soon after crime is " 'entirely reasonable' " and " 'promote[s] fairness, by assuring reliability' " because the " 'memory of the witness [is] still fresh' ") (citations omitted). One of the victims identified Flynn as the armed robber by his voice. According to an officer's testimony, the victim "stated that she wasn't sure as to the identification, but his voice was, because of the accent in his voice, that it sounded just like the guy at the gas station." This, together with the identification of the Flynns' car as the one driven by the robber, gave the officers probable cause to arrest Flynn. *See State v. Mitchell*, 167 Wis. 2d 672, 681, 482 N.W.2d 364, 367 (1992) ("Probable cause refers to the quantum of evidence which would lead a reasonable police officer to believe that the defendant committed a crime."); *State v. Cheers*, 102 Wis. 2d 367, 385–389, 306 N.W.2d 676, 684-686 (1981) (discussing criteria in depth). The arrest was lawful.

### 3. *Cross examination of Mrs. Flynn at trial.*

After Flynn's arrest, the officers found a gun in the house. They did not have a search warrant. The trial court granted Flynn's motion to suppress the gun. Flynn claims that reversal is required because Mrs. Flynn was impeached by the "use" of this suppressed evidence during her cross-examination. We disagree.

Mrs. Flynn testified on direct examination during the course of Flynn's surrebuttal case that she did not sign a statement implicating her husband because the statement "was all lies." During cross-examination, the prosecutor asked Mrs. Flynn the following question: "Do you remember testifying from that same witness chair back on July 27th, 1992, that you were dishonest with the police about something." Mrs. Flynn replied: "One thing. . . . I was not honest about one thing."[3] Although the underlying reference was to Mrs. Flynn's initial denial that there was a gun in the house, the gun itself was never mentioned. Accordingly, contrary to Flynn's argument, Mrs. Flynn was *not* impermissibly impeached by the use of suppressed evidence in violation of the rule announced in *James v. Illinois*, 493 U.S. 307, 320 (1990) (suppressed evidence may not be used to contradict the testimony of defense witnesses other than that of the defendant).

### 4. *Alleged mention of suppressed gun during sidebar conference.*

---

[3] The earlier testimony was during a suppression hearing. This was not disclosed to the jury.

Flynn's brief on this appeal claims that during an unrecorded sidebar conference during the trial, "the prosecutor elicited this suppressed evidence [about the gun] within hearing distance" of the jury. In support of this claim, Flynn cites the prosecutor's complaint to the trial court that Flynn's trial counsel was speaking loudly during the sidebar conferences, and was saying things that would prejudice the prosecution. Although the prosecutor told the trial court that Flynn's trial counsel complained during one of these sidebar conferences that the police "tore that house apart looking for a gun," this statement by Flynn's counsel was not elicited by the prosecutor. Further, the clear import of that statement, if heard by the jury, was that no gun was found because none was introduced during the trial. Flynn also points to what purports to be a transcript of a telephone conversation Mrs. Flynn had with one of the jurors after the trial, and attested to by the juror in an affidavit. In that statement, the juror asserts that the jury discussed a gun during the course of their deliberations. The transcript/affidavit does not, however, indicate that the gun was improperly brought to the jury's attention during the course of the trial:

> [Mrs. Flynn]: Well, Mr. Tump, I did not sit through the trial because I was sequestered, but the gun found in my home was suppressed evidence, so I am curious as to how that information got to the jurors.
>
> Mr. Tump: Well, you are right—I don't remember anything about a gun being argued about at the trial, but—somehow it was an issue and it did become a matter for us to consider and we did.
>
> [Mrs. Flynn]: I understand, but I need to know how that became an issue.

> Mr. Tump: I'm sorry, but I can't really remember which person brought it up, but it was definitely brought up and we did know about it.

(Uppercasing omitted.)

As we have recently stated:

> In determining whether to overturn a verdict and grant a new trial because of juror misconduct, the trial court must first determine whether the jurors are competent to testify regarding the validity of the verdict. *Castenada v. Pederson*, 185 Wis. 2d 200, 209, 518 N.W.2d 246, 249–50 (1994). In order to promote verdict finality and maintain the integrity of the jury as a decision–making body, jurors cannot testify regarding statements made during deliberations and cannot testify regarding the deliberative process that took place in reaching a verdict. *See* § 906.06(2), STATS.; *State v. Shillcutt*, 119 Wis. 2d 788, 793–94, 350 N.W.2d 686, 689 (1984). Section 906.06(2) provides an exception to this rule, allowing jurors to testify "on the question [of] whether extraneous prejudicial information was improperly brought to the jury's attention." The party seeking to impeach the verdict has the burden of proving that a juror's testimony is admissible by establishing: (1) "that the juror's testimony concerns extraneous information (rather than the deliberative processes of the jurors)," (2) "that the extraneous information was improperly brought to the jury's attention," and (3) "that the extraneous information was potentially prejudicial." *State v. Poh*, 116 Wis. 2d 510, 520, 343 N.W.2d 108, 114 (1984).
>
> If a party satisfies this burden, the juror's testimony is deemed admissible; however, to overturn the verdict, the party must also prove by clear, satisfactory and convincing evidence that there is a

> reasonable possibility that the extraneous informa-
> tion would prejudice a hypothetical average jury.
> *State v. Messelt*, 185 Wis. 2d 255, 282–83, 518
> N.W.2d 232, 243 (1994).

*State v. Eison*, 188 Wis. 2d 298, 304-305, 525 N.W.2d 91, 93 (Ct. App. 1994). In light of the ambiguous nature of the juror's recollection, Flynn has not carried his burden under the second prong by "clear, satisfactory and convincing evidence." These were armed robberies; it would be natural for the jury to discuss a gun during its deliberations. There is no evidence in the record that the jury discussed the gun that was suppressed by the trial court.[4]

5. *Effectiveness of Flynn's trial counsel.*

Every criminal defendant has a Sixth Amendment right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S 668, 686 (1984). In order to establish violation of this fundamental right, a defendant must prove two things: (1) that his or her lawyer's performance was deficient, and, if so, (2) that "the deficient performance prejudiced the defense." *Id.*, 466 U.S. at 687. A lawyer's performance is not deficient unless he or she "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Ibid.* Further, a

---

[4] Flynn has attached to his brief on this appeal his affidavit to the effect that the prosecutor said at a sidebar conference that the police during the course of their search of Flynn's home "found the gun that was suppressed." (Uppercasing omitted.) As an appellate court, we are limited to the record as it comes to us from the trial court; we may not consider Flynn's affidavit. *See State v. Kuhn*, 178 Wis. 2d 428, 439, 504 N.W.2d 405, 411 (Ct. App. 1993). Flynn did not testify at the post-conviction hearing.

defendant is not entitled to a reversal based on the deficient performance of trial counsel unless the defendant can establish both that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable," *ibid.*, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.*, 466 U.S. at 694. The crux is "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 113 S. Ct. 838, 844, 122 L.Ed.2d 180, 191 (1993). Although we give deference to the trial court's findings of historical fact, whether the facts found by the trial court show that the lawyer's performance was deficient and, if so, whether the deficient performance was prejudicial, are legal issues that we decide independent of the trial court's determination. *See State v. Pitsch*, 124 Wis. 2d 628, 634, 369 N.W.2d 711, 715 (1985).

Flynn claims that he was denied effective assistance of counsel in two respects. We discuss these claims in turn.

A. *Alleged failure by trial counsel to adequately investigate case.*

Flynn claims that his trial counsel failed to discover that one of the service stations he was accused of robbing had surveillance cameras on that night, that the station was closed to customers when the robbery took place, and that there was an alleged feud between Mrs. Flynn and the family of the woman who worked at the service station. The trial court held an evidentiary hearing, as is required by *State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905, 908 (Ct. App. 1979).

47

Two witnesses testified at the *Machner* hearing: Flynn's trial counsel and Mrs. Flynn. Flynn did not testify. Under *Strickland*, we need not analyze counsel's performance unless the defendant can demonstrate that any alleged deficiencies prejudiced his or her right to a fair trial. *Strickland*, 466 U.S at 687; *State v. Johnson*, 153 Wis. 2d 121, 128, 449 N.W.2d 845, 848 (1990). Moreover, "[a] defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989). *See also Jandrt v. State*, 43 Wis. 2d 497, 505-506, 168 N.W.2d 602, 607 (1969). Flynn has failed to satisfy this burden; he has not demonstrated how the investigation he claims should have been done would have affected the result of his trial.

Mrs. Flynn testified at the *Machner* hearing that she did not know whether the surveillance cameras were working during the robbery. Further, Flynn has not shown how the issue of whether the station was open for business at the time of the robbery was material to his defense, and has not tied the alleged feud to the facts of his case beyond mere speculation. Indeed, Flynn's allegations of deficient investigation are premised on speculation—"might haves" strung together in a series that leads nowhere. Accordingly, as to this aspect of his claim that his trial counsel was ineffective he has failed to establish that "the result of the proceeding would have been different." *See Strickland*,

466 U.S. at 694; *Pitsch*, 124 Wis. 2d at 642, 369 N.W.2d at 719.[5]

B. *Flynn's desire to testify on his own behalf.*

"[T]he right to testify on one's own behalf in defense to a criminal charge is a fundamental constitutional right." *Rock v. Arkansas*, 483 U.S. 44, 53 n.10 (1987). This right is personal to the defendant, and may be waived only by the defendant. *Jones v. Barnes*, 463 U.S. 745, 751 (1983) ("[T]he accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to . . . testify in his or her own behalf.") (*dictum*); *State v. Wilson*, 179 Wis. 2d 660, 670–672, 508 N.W.2d 44, 48 (Ct. App. 1993), *cert. denied*, 115 S. Ct. 100; *see also State v. Simpson*, 185 Wis. 2d 772, 778–779, 519 N.W.2d 662, 663-664 (Ct. App. 1994). The defendant's waiver must be knowing and voluntary. *Wilson*, 179 Wis. 2d at 671–672, 508 N.W.2d at 48; *see also Simpson*, 185 Wis. 2d at 778–779, 519 N.W.2d at 664.

Flynn did not testify at the trial. He claims that he did not testify because his trial counsel threatened to withdraw from the case if he insisted on taking the

---

[5] Flynn also argues that we should exercise our discretionary power of reversal under § 752.35, STATS., because, in his view, as a result of his trial counsel's deficient investigation, the "real controversy" was not tried. As we have previously indicated, however, § 752.35 "was not intended to vest this court with power of discretionary reversal to enable a defendant to present an alternative defense" that may have not been advanced by trial counsel at the first trial whose representation is alleged to be ineffective because of that failure. *State v. Hubanks*, 173 Wis. 2d 1, 29, 496 N.W.2d 96, 106 (Ct. App. 1992), *cert. denied*, 114 S. Ct. 99.

49

witness stand. During the *Machner* hearing, Flynn's trial counsel admitted making that threat, affirming that he would have asked the court to relieve him of his responsibility to represent Flynn if Flynn persisted in his desire to testify. The lawyer, however, in response to questioning by Flynn, recognized that the decision was one for Flynn to make, and contended that Flynn eventually took his advice:

> [Y]ou ultimately agreed with me that you would not take the stand, you would follow my advice; and your wife was in my corner on that and agreed with me that as long as you felt that strongly about it, you should listen to me and abide by my decision. I was trying to do what was in your best interests.

Flynn's trial counsel based his advice on, in part, his view that Flynn could be impeached as a witness with seven prior convictions, *see* RULE 906.09, STATS., and that the gun found in Flynn's home that had been suppressed could also be used as impeachment if Flynn testified, *see James*, 493 U.S. at 312 (illegally obtained evidence may be used to impeach the credibility of a defendant's testimony). The trial court considered both aspects of the *Strickland* test, and found that Flynn's trial counsel was not ineffective, and that there was no prejudice.

The two-part *Strickland* test is "the appropriate vehicle" to assess a defendant's contention that his or her "right to testify was violated by defense counsel." *United States v. Teague*, 953 F.2d 1525, 1534 (11th Cir. 1992) *(en banc)*, *cert. denied*, 113 S. Ct. 127; *see also People v. Naranjo*, 840 P.2d 319, 323 (Colo. 1992); *Commissioner of Correction v. Rodriguez*, 610 A.2d 631, 635 (Conn. 1992). Under *Strickland*, we need not analyze counsel's performance if any alleged deficiencies

did not prejudice the defendant. *Strickland*, 466 U.S at 687; *Johnson*, 153 Wis. 2d at 128, 449 N.W.2d at 848. The trial court did not make any findings as to whether Flynn knowingly and voluntarily relinquished his right to testify by ultimately agreeing with his lawyer.[6] We may not decide issues of fact, *Wurtz v. Fleischman*, 97 Wis. 2d 100, 107 n.3, 293 N.W.2d 155, 159 n.3 (1980), and we would have to remand to the trial court for further fact finding if this case turned on a resolution of that issue. A remand is not necessary, however, because we are convinced that Flynn was not prejudiced, even if we assume that Flynn's trial counsel *did* prevent Flynn from testifying.[7]

---

[6] As noted, Flynn did not testify at the *Machner* hearing.

[7] Contrary to the premise that underlies the Dissent's exegesis, an analysis of prejudice under *Strickland's* second prong is *not* a harmless-beyond-a-reasonable-doubt inquiry. *Lockhart v. Fretwell*, 113 S. Ct. 838, 843 n.2, 122 L.Ed.2d 180, 189 n.2 (1993). Although, as noted *infra*, the "harmless error" cases can shine light on our examination, the two concepts are not fungible in the context of this case. Simply put, we analyze Flynn's ineffective-assistance-of-counsel claim to determine whether he has established prejudice. We discuss "harmless error" later in this opinion only to determine whether it is appropriate to apply the "prejudice" component of *Strickland* in cases where a defendant claims that trial counsel prevented the defendant from testifying at trial. The Dissent sets fire to a straw man of its own contrivance when it frames the issue as one of whether there was "harmless error," even with the word "prejudice" appended. The State must prove "harmless error" beyond a reasonable doubt. *State v. Rewolinski*, 159 Wis. 2d 1, 27-28, 464 N.W.2d 401, 411-412 (1990), *cert. denied*, 500 U.S. 909; *State v. Dyess*, 124 Wis. 2d 525, 544 n.11, 370 N.W.2d 222, 232 n.11 (1985). The *defendant*, on the other hand, must show "prejudice," *Dyess*, 124 Wis. 2d at 544 n.11, 370 N.W.2d at 232 n.11.

Flynn has had a fair trial, and there is no reasonable likelihood of a different outcome on a retrial should he testify. First, there was substantial eyewitness identification of both Flynn and the Flynns' car by the victims of the robberies. Second, as Flynn's trial counsel recognized, the suppressed gun would most likely have been a prime topic of Flynn's cross-examination had he testified, and would be a prime topic of that cross-examination should he testify at any retrial. Further, a testifying Flynn would be impeached by at least some of his seven prior convictions. These are appropriate considerations in determining whether Flynn was prejudiced by his failure to testify at the trial. *See Rodriguez*, 631 A.2d at 636–637. Flynn's lawyer gave him good advice; Flynn is not entitled to a second roll of the dice with the hope that this time he will get lucky. *See Strickland*, 466 U.S. at 695 ("The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision."); *see also Fretwell*, 113 S. Ct. at 843, 122 L.Ed.2d at 189 ("The touchstone of an ineffective assistance claim is the fairness of the adversary proceeding, and 'in judging prejudice and the likelihood of a different outcome, "[a] defendant has no entitlement to the luck of a lawless decisionmaker." ' ") (citations omitted).

The Dissent would impose a *per se* rule mandating reversal whenever trial counsel prevents a defendant from testifying, irrespective of the likelihood of a different outcome on any retrial. We have found only one instance where such a *per se* rule has been imposed—with little underlying analysis. *United States v. Butts*, 630 F. Supp. 1145, 1148–1149 (D. Me.

1986).[8] As far as we are aware, no appellate panel, either state or federal, has imposed such a rule. Rather, the appellate cases apply *Strickland*'s two-step test. *Nichols v. Butler*, 953 F.2d 1550, 1552–1554 (11th Cir. 1992) (*en banc*) (defense attorney threatened to withdraw—close case, prejudice found); *Naranjo*, 840 P.2d at 323–325, 326; *Rodriguez*, 610 A.2d at 636 n.9; *see also Teague*, 953 F.2d at 1534–1535 (not reaching prejudice). We believe that a *per se* rule is inappropriate for the reasons we now discuss.

Although, as we have noted, an analysis of prejudice under *Strickland's* second prong is not a harmless-beyond-a-reasonable-doubt inquiry, *Fretwell*, 113 S. Ct. at 843 n.2, 122 L.Ed.2d at 189 n.2, the two inquiries are conceptually similar.[9] *See State v. Myren*, 133 Wis. 2d 430, 441, 395 N.W.2d 818, 824 (Ct. App. 1986) (The " 'reasonable probability' test" under the harmless-error analysis established by *State v. Dyess*, 124 Wis. 2d 525, 543, 370 N.W.2d 222, 231-232 (1985), "is substantively the same as the 'reasonable probability' test declared by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 694 (1984). *Dyess*, 124 Wis. 2d at 544, 370 N.W.2d at 232."). Both

---

[8] Interestingly, *Butts* relied on a *dissenting opinion* in *Wright v. Estelle*, 572 F.2d 1071 (5th Cir. 1978) (*en banc*), *cert. denied*, 439 U.S. 1004, which held that the refusal of a defense attorney to let the defendant testify was harmless beyond a reasonable doubt. "Like most minority opinions," the dissent in *Wright* "is not what the law is, but what it is not." *See State v. O'Connell*, 179 Wis. 2d 598, 614–615, 508 N.W.2d 23, 30 (Ct. App. 1993).

[9] A finding of "prejudice" under *Strickland*'s second prong precludes logically a finding that the error was harmless beyond a reasonable doubt. *People v. Naranjo*, 840 P.2d 319, 326 (Colo. 1992).

require a balancing of, on one side, the system's need for reliable results, and, on the other side, the system's need for an end to litigation. *See Chapman v. California*, 386 U.S. 18, 22 (1967) (harmless error); *Strickland*, 466 U.S. at 691–694 (prejudice); *cf. Morris v. Slappy*, 461 U.S. 1, 15 (1983) (trials are not "sporting contests" where the " 'inquiry is, Have the rules of the game been carried out strictly?' ") (citation omitted). Accordingly, we turn to the cases that discuss "harmless error" in the context of constitutional violations only to assist our determination of whether the prejudice prong of the *Strickland* test should be applied in cases where trial counsel has prevented the defendant from testifying.

Constitutional violations are generally subject to a harmless-error analysis. *Arizona v. Fulminante*, 499 U.S. 279, 306–307 (1991) (Rehnquist, C.J., for the Court) (citing examples).[10] Thus, a conviction will be

---

[10] Since this Court's landmark decision in *Chapman v. California*, 386 U.S. 18 (1967), in which we adopted the general rule that a constitutional error does not automatically require reversal of a conviction, the Court has applied harmless-error analysis to a wide range of errors and has recognized that most constitutional errors can be harmless. *See, e.g., Clemons v. Mississippi*, 494 U.S. 738, 752-754 (1990) (unconstitutionally overbroad jury instructions at the sentencing stage of a capital case); *Satterwhite v. Texas*, 486 U.S. 249 (1988) (admission of evidence at the sentencing stage of a capital case in violation of the Sixth Amendment Counsel Clause); *Carella v. California*, 491 U.S. 263, 266 (1989) (jury instruction containing an erroneous conclusive presumption); *Pope v. Illinois*, 481 U.S. 497, 501-504 (1987) (jury instruction misstating an element of the offense); *Rose v. Clark*, 478 U.S. 570 (1986) (jury instruction containing an erroneous rebuttable presumption); *Crane v. Kentucky*, 476 U.S. 683, 691 (1986) (erroneous exclusion of defendant's testimony regarding the circumstances of his confession); *Delaware v. Van Arsdall*, 475 U.S. 673 (1986) (restriction on a defendant's right to cross-

54

upheld even in the face of a violation of a defendant's constitutional rights if, under the circumstances of the case, it can be shown beyond a reasonable doubt that a "trial error" as opposed to a "structural defect[ ] in the

examine a witness for bias in violation of the Sixth Amendment Confrontation Clause); *Rushen v. Spain*, 464 U.S. 114, 117-118, and n. 2 (1983) (denial of a defendant's right to be present at trial); *United States v. Hasting*, 461 U.S. 499 (1983) (improper comment on defendant's silence at trial, in violation of the Fifth Amendment Self-Incrimination Clause); *Hopper v. Evans*, 456 U.S. 605 (1982) (statute improperly forbidding trial court's giving a jury instruction on a lesser included offense in a capital case in violation of the Due Process Clause); *Kentucky v. Whorton*, 441 U.S. 786 (1979) (failure to instruct the jury on the presumption of innocence; *Moore v. Illinois*, 434 U.S. 220, 232 (1977) (admission of identification evidence in violation of the Sixth Amendment Counsel Clause); *Brown v. United States*, 411 U.S. 223, 231-232 (1973) (admission of the out-of-court statement of a nontestifying codefendant in violation of the Sixth Amendment Counsel Clause); *Milton v. Wainwright*, 407 U.S. 371 (1972) (confession obtained in violation of *Massiah v. United States*, 377 U.S. 201 (1964)); *Chambers v. Maroney*, 399 U.S. 42, 52-53 (1970) (admission of evidence obtained in violation of the Fourth Amendment); *Coleman v. Alabama*, 399 U.S. 1, 10-11 (1970) (denial of counsel at a preliminary hearing in violation of the Sixth Amendment Counsel Clause).

The common thread connecting these cases is that each involved "trial error"—error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt. In applying harmless-error analysis to these many different constitutional violations, the Court has been faithful to the belief that the harmless-error doctrine is essential to preserve the "principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error."

*Arizona v. Fulminante*, 499 U.S. 279, 306-307 (1991) (Rehnquist, C.J., for the Court).

constitution of the trial mechanism," *Fulminante*, 499 U.S. at 309 (Rehnquist, C.J., for the Court), did not contribute to the guilty verdict, *Chapman*, 386 U.S. at 24. The inquiry is case-specific, namely "not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand." *Sullivan v. Louisiana*, 113 S. Ct. 2078, 2081, 124 L.Ed.2d 182, 189 (1993). Although some constitutional errors that are structural defects—total deprivation of the right to counsel, trial by a biased judge, deprivation of the defendant's right to self-representation—have been held to so vitiate the jury-trial right that no harmless-error analysis is appropriate, *ibid.*, contrary to what the Dissent argues, the harmless-error analysis *does* apply to the deprivation of a defendant's right to testify, *see Crane v. Kentucky*, 476 U.S. 683, 691 (1986) (exclusion of defendant's attempted explanation of the circumstances of an alleged confession subject to harmless-error analysis); *Ortega v. O'Leary*, 843 F.2d 258, 262 (7th Cir. 1988), *cert. denied*, 488 U.S. 841; *cf. Nix v. Whiteside*, 475 U.S. 157 (1986) (trial counsel not deficient, and defendant not prejudiced by counsel's refusal to sanction perjured testimony by defendant). Moreover, even certain structural defects in the trial mechanism are subject to *Strickland*'s prejudice prong if those defects were caused by defense counsel, *Batiste v. State*, 888 S.W.2d 9, 14-16 (Tex. Cr. App. 1994) (waiver by trial counsel of *Batson v. Kentucky*, 476 U.S. 79 (1986), violation), even though a "harmless error" analysis would not be appropriate, *id.*, 888 S.W.2d at 13-14. We decline the Dissent's invitation to ignore the required two-prong *Strickland* analysis and impose a *per se* rule, which would require reversal in those cases

56

where trial counsel prevents a defendant from testifying, irrespective of overwhelming evidence of guilt.

6 *State's alleged failure to prove an essential element of robbery.*

A person does not commit armed robbery unless property is taken "from the person or presence of the owner." Section 943.32(1), STATS. "Owner" is "a person in possession of property whether his possession is lawful or unlawful." Section 943.32(3), STATS. Constructive possession of the property is sufficient. *See* § 971.33, STATS.; *State v. Mosley*, 102 Wis. 2d 636, 645, 307 N.W.2d 200, 206-207 (1981).

Flynn complains that there was no proof that money was in fact taken, that the money was not returned, that the victims were actually employed by the service stations, and that the money taken belonged to any of the victims (as opposed, presumably, their employers). These contentions are without merit. There was sufficient evidence for the jury to reasonably conclude that both victims worked at the service stations, and that money belonging to the service stations was taken from them by Flynn. Indeed, the employees of both service stations testified that Flynn robbed them, and they identified him in court as the robber. *See State v. Poellinger*, 153 Wis. 2d 493, 507, 451 N.W.2d 752, 757-758 (1990) (verdict must stand unless "no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt"). There was no need, as Flynn argues, for the station owners to testify at the trial.

57

7–11.[11] *Flynn's unbriefed arguments.*

■

Flynn's brief identifies but does not develop five additional arguments. Rather, he refers us to the material he presented to the trial court. This is unacceptable. This court has repeatedly denied Flynn leave to exceed the page-number limit imposed by RULE 809.19(8)(c), STATS. He may not circumvent those orders by failing to revise his brief so it complies with the rule, and then attempt to incorporate by reference other documents. As pointed out in footnote 2, we will not consider arguments that he has not developed in his brief on this appeal.

*By the Court.*—Judgment and orders affirmed.

SCHUDSON, J. (*concurring in part; dissenting in part*). I join the majority's opinion on all issues except one. I write separately to declare most emphatically that a lawyer who, during a trial, threatens to withdraw from representation if the client elects to exercise the constitutional right to testify, is a lawyer who has provided ineffective assistance of counsel.

Contrary to the impression one might receive from the majority's discussion, the issue is not whether counsel's advice to Flynn was sound. Nor is the issue in this case whether a lawyer can vigorously attempt to persuade a client not to testify. The issue is whether, constitutionally, a lawyer provides ineffective assistance when, in order to persuade a client not to testify,

---

[11] In Flynn's brief, there are two argument number "VIII"s. There is no argument number "VII."

the lawyer threatens to withdraw from representation during a trial.[1]

The majority acknowledges, " '[T]he right to testify on one's own behalf in defense to a criminal charge is a fundamental constitutional right.' " Majority op. at 49 (quoting *Rock v. Arkansas*, 483 U.S. 44, 53 n.10 (1987)). Further, the majority acknowledges, "Every criminal defendant has a Sixth Amendment right to the effective assistance of counsel." Majority op. at 46 (citing *Strickland v. Washington*, 466 U.S. 668, 686 (1984)). Finally, the majority also acknowledges that some constitutional errors, including deprivation of the right to counsel, so totally vitiate the jury trial right that harmless error analysis is inappropriate. Majority op. at 56 (citing *Sullivan v. Louisiana*, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182, 189 (1993)). Nevertheless, the majority still asserts that "the harmless-error analysis *does* apply to the deprivation of a defendant's right to testify," majority id., even when that deprivation is inextricably connected to a threatened deprivation of right to counsel. I disagree.

The facts are undisputed. According to the testimony at the postconviction motion, Flynn told his lawyer, Herbert Usow, that he was not guilty of at least one of the charges. Flynn also told Usow, repeatedly, both before and during the trial, that he wanted to testify. Usow testified that Flynn "wanted to take [the

[1] The majority claims that this dissent "would impose a *per se* rule mandating reversal whenever trial counsel prevents a defendant from testifying." Majority op. at 52. That is not correct. Clearly and constitutionally, a lawyer's fair and vigorous persuasion may prevent a defendant from testifying. This dissent addresses only the unconstitutional prevention of the defendant's testimony resulting from the threatened denial of counsel during the trial.

stand] desperately." Usow repeatedly acknowledged that he threatened to withdraw should Flynn take the stand. Responding to Flynn's *pro se* questions at the postconviction motion, counsel could not have been more clear:[2]

> Q: You threatened to walk out of the Court on me, didn't you?
> A: Yes.
> Q: If I wanted to take the stand, you said: you take this case and try it myself, because I will get out of here?
> A: I said I will ask the Court of my relief of my responsibility to represent you.

Later in the hearing:

> Q: Did I not, Mr. Usow, did I not think it was important if I don't know nothing else, if you don't think they hear my voice, if I can get exonerated from Count One, I, at least, get up there and tell them: Yeah, I just got out of prison, that's why I am here?
> A: I thought it would be poor psychology.
> Q: That's exactly my point. You thought it was. I tried every way in the world to get you to agree to me to take the witness stand.
> A: I tried every way in the world to stop you.

---

[2] Indeed, although the trial court did not conclude that counsel was ineffective, it noted his emphatic style:

> As I look at this case before me, whatever Mr. Usow may be, *argumentative, sometimes rude, assaultive to a certain extent,* I don't think from the vociferous endeavor that he made during the course of your trial, that you could say he was ineffective or did not reach the usual standard that we commonly refer to as being competent within the legal field or commun ty in this County.

(Emphasis added.)

Later in the hearing, responding to questions from the prosecutor, Usow further emphasized:

A: Under no circumstances, if I were to try the case over again today, would I ever allow him to take the witness stand. I think any lawyer that would, would be guilty of malpractice or certainly poor judgment, if he allowed him to take the witness stand.

Q: When you say "allow," not physically preventing him from taking the witness stand?

A: That was a choice he would have to make; but if I were defending, as I told him, I would ask the Court to relieve me of my obligation, because as I have said before, that would be tantamount to throwing in a guilty plea.

Finally, in responding to Flynn's questions on re-direct at the postconviction motion, Usow and Flynn had this exchange:

Q: You never threatened to walk out, Mr. Usow?

A: I told you at all times, if you want to take the witness stand, you would have to get another attorney.

As the majority concedes, a lawyer's performance is deficient if "he or she 'made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" Majority op. at 46 (quoting *Strickland*, 466 U.S. at 687). It is self-evident that *a lawyer threatening to not be a defendant's lawyer in order to force the defendant to relinquish a fundamental constitutional right* is "not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."

To characterize a proposition as "self-evident" is, at times, to sidestep critical analysis that may belie the

proposition. The Supreme Court, however, provided a revealing corollary when, in *Sullivan v. Louisiana*, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), it declared, "It is self-evident, we think, that the Fifth Amendment requirement of proof beyond a reasonable doubt and the Sixth Amendment requirement of a jury verdict are interrelated." *Sullivan*, 113 S.Ct. at 2081, 124 L.Ed. at 188. Thus, *Sullivan* helps one understand that when the inextricable linkage between two fundamental constitutional rights forms the chain of constitutional protection, cutting either link destroys the chain. Here, as in *Sullivan*, we have such linkage. Here, as in *Sullivan*, the "constitutional deprivation[ ] is a similar structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). Thus, the prejudice/harmless error analysis is inapplicable.[3] *Id.*; *see also Sullivan*, 113 S.Ct. at 2082, 124 L.Ed. at 189.

"The government may not require individuals to choose between two constitutional rights." *Schwantes v. Schwantes*, 121 Wis. 2d 607, 625, 360 N.W.2d 69, 77 (Ct. App. 1983). Just as certainly, a lawyer may not

---

[3] The majority quarrels with my references to "harmless-error analysis." Majority op. at 51 n. 7. Why? As the majority explains, prejudice under *Strickland* and harmless error "are conceptually similar." Majority op. at 53. Understandably, the majority blends the two concepts. Majority op. at 54 ("Accordingly, we turn to the cases that discuss 'harmless error' in the context of constitutional violations only to assist our determination of whether the prejudice prong of the *Strickland* test should be applied in cases where trial counsel has prevented the defendant from testifying."). Therefore, except when citing the majority's own references to harmless error analysis, I refer to "prejudice/harmless error analysis."

require a defendant to choose between two constitutional rights. A lawyer must never force a defendant to stay off the witness stand in order to retain legal representation.[4]

---

[4] In *Nichols v. Butler*, 953 F.2d 1550 (11th Cir. 1992) (*en banc*), a case on which the majority relies, the court effectively explained:

> It is beyond question that an attorney cannot threaten to withdraw during a trial in order to coerce the defendant to relinquish his fundamental right to testify. All attorneys have an ethical obligation to represent their clients competently and zealously. An attorney should seek to withdraw from representation only where there are compelling circumstances, Model Code of Professional Responsibility EC 2-32 (1986), and only "if withdrawal can be accomplished without material adverse effect on the interests of the client." Ala.Rules of Professional Conduct 1.16(b) (1991); *see also* Model Code of Professional Responsibility DR 2-110(A)(2) (1986) ("a lawyer shall not withdraw from employment until he has taken reasonable steps to avoid foreseeable prejudice to the rights of his client, including giving due notice to his client, allowing time for employment of other counsel . . . and complying with applicable laws and rules"). Where a trial has already begun, the risk of prejudice to the client from withdrawal of counsel is significant. The decision by a defendant to exercise his fundamental right to testify at his own criminal trial, without more, is clearly not a sufficient reason for his attorney to seek to withdraw, even where that decision is against the advice of counsel. Of course, counsel should advise his client in the strongest terms possible if he feels that it would be unwise for the client to testify. However, to coerce his client into remaining silent by threatening to abandon him mid-trial goes beyond the bounds of proper advocacy. . . .
>
> . . . The testimony of a criminal defendant at his own trial is unique and inherently significant. "The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself." When the defendant testifies, the jury is given an opportunity to observe his demeanor and to judge his credibility firsthand. As the United States Supreme Court noted in *Rock v. Arkansas*, "the most important witness for the defense in many criminal cases is the defendant himself." Further, in a case such as this where the question was not whether a crime was committed but whether *the defendant* was the

63

Flynn had the right to testify. Flynn also had the right to representation by counsel. To force him to relinquish the first right in order to retain the second was a failure to "function [ ] as the 'counsel' guaranteed the defendant by the Sixth Amendment." This failure, under *Fulminante* and *Sullivan*, is a "structural defect" that " 'transcends the criminal process.' " *Fulminante*, 499 U.S. at 310-311. Thus, it does not allow for prejudice/harmless error analysis; a new trial is required. Accordingly, on this issue, I respectfully dissent.

person who committed the crime, his testimony takes on even greater importance. Indeed, "[w]here the very point of a trial is to determine whether an individual was involved in criminal activity, the testimony of the individual himself must be considered of prime importance."

*Id.* at 1553-1554 (footnotes and case citations omitted; emphasis in original). Although, as the majority points out, the court in *Nichols* did utilize *Strickland's* two-step analysis to measure prejudice, the court did not explicitly address whether harmless error analysis is appropriate. Clearly, under *Sullivan*, it is not.