STATE of Wisconsin, Plaintiff-Respondent,

v.

David ARREDONDO, Defendant-Appellant.†

Court of Appeals

*No. 02–2361–CR. Submitted on briefs November 4, 2003.—
Decided December 23, 2003.*

2004 WI App 7

(Also reported in 674 N.W.2d 647.)

† Petition to review denied 2-24-04.

375

378

On behalf of the defendant-appellant, the cause was submitted on the briefs of *James Rebholz* of *Rebholz, Auberry & Malone*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager*, attorney general, and *Sally L. Wellman*, assistant attorney general.

Before Wedemeyer, P.J., Fine and Curley, JJ.

¶ 1. FINE, J. David Arredondo appeals from a judgment entered on jury verdicts convicting him of first-degree intentional homicide and second-degree

sexual assault, and from an order denying his postconviction motion for a new trial.[1] *See* Wis. Stat. §§ 940.01(1), 940.225(2)(a). Arredondo claims that: (1) his constitutional right to testify was violated; (2) his trial counsel was ineffective; (3) the trial court erred when it denied his postconviction motion; (4) the sentencing court relied on an improper factor; and (5) his judgment should be vacated in the interest of justice. We affirm.

## I.

¶ 2. David Arredondo was charged with sexually assaulting and killing Desiree Klamann. According to witnesses, Klamann was last seen alive with Arredondo at the Cinco de Mayo festival on May 4, 1997. Her naked and beaten body was found wrapped in a comforter in a garbage dumpster on May 8, 1997. The police discovered Arredondo's semen on the comforter and found Klamann's blood on the molding of Arredondo's bedroom. The police also saw that someone had recently painted half-way up the walls of Arredondo's bedroom. They sprayed luminol, a chemical designed to detect blood that is not otherwise visible to the unaided eye, on the walls and discovered blood underneath the paint.

¶ 3. Arredondo pled not guilty and went to trial. The State called several witnesses, including Arredondo's former roommate, Thomas Garza. Garza testified that, on May 4, 1997, he got back to the apartment he shared with Arredondo around 9:30 or

---

[1] The Honorable Diane S. Sykes presided over the trial and entered the judgment of conviction. The Honorable M. Joseph Donald presided over the postconviction hearing and issued the order denying Arredondo's postconviction motion.

9:45 p.m. While Garza was in the kitchen getting a drink, he saw Arredondo run naked from his bedroom to the bathroom. According to Garza, he laughed and asked Arredondo what was going on. Arredondo told Garza that he had to "take a leak" and could not wait. After Arredondo returned to his bedroom, Garza went to his own bedroom, watched television in bed, and fell asleep. Garza testified that he heard a woman's voice while he was sleeping, but was not sure where the voice came from because his television was still on.

¶ 4. The State also called as a witness Arredondo's former cellmate, Kurt Moederndorfer. Moederndorfer testified that, while he shared a cell with Arredondo at the Milwaukee County Jail, Arredondo told him about the crime. According to Moederndorfer, Arredondo met a woman at the Cinco de Mayo festival. Arredondo and the woman spent the day together drinking and having a "good time." Moederndorfer testified that Arredondo convinced the woman to go home with him, took her into his bedroom, and "tried to make his moves on her." Arredondo told Moederndorfer that, when the woman resisted, he grabbed her by the throat, choked her, and forced her to have sexual intercourse with him. When Moederndorfer asked Arredondo if the police had any evidence, Arredondo replied: " 'I took care of that . . . . I painted the walls in the bedroom and got rid of a mattress and some kind of old rug . . . in a dumpster.' "

¶ 5. The State rested and the trial court had an on-the-record colloquy with Arredondo to determine if Arredondo wanted to testify. Arredondo's attorney told the trial court that Arredondo did not want to testify and that Arredondo's decision was "99 percent definite" pending the testimony of two defense witnesses. Arredondo then assured the trial court that he understood, and waived his right to testify.

¶ 6. After Arredondo's waiver of his right to testify, the defense called two men who lived in the apartment above Arredondo to testify about the night Klamann was killed. The defense rested and the trial court informed the jury that the evidentiary phase of the trial was complete, and dismissed it for lunch. After the lunch break, Arredondo told the court that he wanted to rescind his decision not to testify because he did not understand what rights he was giving up.

¶ 7. Arredondo's attorney told the court that, before he rested, he asked Arredondo if he wanted to testify and Arredondo confirmed that he did not. The trial court then asked the State about potential prejudice. The assistant district attorney told the court that its rebuttal witnesses had been released but that "they probably could . . . be relocated." The trial court concluded that Arredondo "was fully advised of his rights [and] made an informed, knowing and voluntary decision."

¶ 8. As noted, a jury found Arredondo guilty of first-degree intentional homicide and second-degree sexual assault. The trial court sentenced him to life in prison without parole on the homicide count and twenty years in prison on the sexual-assault count, consecutive to the homicide sentence.

¶ 9. Arredondo filed a postconviction motion for a new trial, alleging that his trial counsel was ineffective. The trial court held a hearing pursuant to *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979). It limited the testimony at the *Machner* hearing to Arredondo, Arredondo's trial attorney, and the assistant district attorney who tried the case. The court did, however, accept and review all written submissions from the parties, including proffers of testimony and affidavits from the witnesses Arredondo wished to

present. After considering all of the evidence, the trial court concluded that Arredondo's trial counsel was not ineffective.

## II.

### A. *Right to Testify*

¶ 10. Arredondo claims that his constitutional rights were violated when the trial court declined to reopen the evidence to allow him to testify. He attacks the validity of the trial court's decision on several grounds. First, he alleges that the "totality of the record" does not show that he knowingly and voluntarily waived his right to testify. We disagree.

¶ 11. A defendant's right to testify is a fundamental constitutional right. *State v. Simpson*, 185 Wis. 2d 772, 778, 519 N.W.2d 662, 663 (Ct. App. 1994). A defendant may, however, waive the right to testify. *State v. Wilson*, 179 Wis. 2d 660, 670–672, 508 N.W.2d 44, 48 (Ct. App. 1993), *overruled on other grounds by State v. Weed*, 2003 WI 85, 263 Wis. 2d 434, 666 N.W.2d 485. "The standard is whether the record demonstrates that the defendant knowingly and voluntarily waived the right." *Simpson*, 185 Wis. 2d at 778–779, 519 N.W.2d at 664.

¶ 12. A trial court's ruling on whether a waiver was knowing and voluntary presents mixed questions of fact and law. *See Reckner v. Reckner*, 105 Wis. 2d 425, 435, 314 N.W.2d 159, 164 (Ct. App. 1981). We will uphold the trial court's findings of fact unless they are clearly erroneous. *State v. Richardson*, 156 Wis. 2d 128,

137, 456 N.W.2d 830, 833 (1990). The application of the facts to the constitutional principles is a question of law that we review *de novo. Id.*, 156 Wis. 2d at 137–138, 456 N.W.2d at 833.

■

¶ 13. We consider the totality of the record, including the record of the postconviction proceedings, in deciding whether Arredondo knowingly and voluntarily waived his right to testify. *Simpson*, 185 Wis. 2d at 779, 519 N.W.2d at 664. The trial court had the following colloquy with Arredondo and his attorney after the State rested:

> THE COURT: It is my understanding the defendant has elected not to testify although [he] wants to reserve the right to change that after these two witnesses testify. Is that right?
>
> [ARREDONDO'S ATTORNEY]: The defendant's elected not to testify, Your Honor.
>
> THE COURT: And that's a definite decision?
>
> [ARREDONDO'S ATTORNEY]: That's a definite decision. I would say 99 percent definite. I don't expect anything from these two witnesses that would change his mind, but you never know.
>
> THE COURT: We can address it again after the witnesses testify, but let me just confirm with you, . . . that you have discussed the defendant's options with him in that regard.
>
> [ARREDONDO'S ATTORNEY]: I have, Your Honor.
>
> THE COURT: And Mr. Arredondo, I need to confirm with you that you have discussed your decision

regarding testifying in this case with your counsel and the options that you have in that regard. You have done so?

THE DEFENDANT: Yes, Your Honor.

THE COURT: You understand that you have an absolute constitutional right not to testify in this case, and if you decide, as evidently you have decided, not to testify in this case, the jury will be instructed that they cannot hold that against you. They cannot draw any conclusions from that. Do you understand?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you also understand, Mr. Arredondo, that you have a corresponding right to testify and take the witness stand in your own defense. If you do that, you would be subjecting yourself to cross-examination. Do you recognize that as well?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Knowing that you have these corresponding rights and how they apply here and in consultation with your counsel, you have made the decision not to testify in this case, correct?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And although that decision has been made in consultation with your counsel, it is, nonetheless, your own decision; is that correct?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Let's proceed.

This exchange unequivocally demonstrates that Arredondo was aware of his right to testify, and discussed that right with his lawyer. *See Weed*, 2003 WI 85,

¶ 43, 263 Wis. 2d at 464, 666 N.W.2d at 499 (colloquy should consist of inquiry to ensure that defendant was aware of his right to testify and discussed the right with counsel). Nonetheless, Arredondo alleges that his waiver was not valid because it was conditional. He claims that the trial court should have conducted another colloquy with him after the two defense witnesses testified to determine whether he still wanted not to testify. We do not agree.

¶ 14. As noted, Arredondo told the trial court that he wanted to rescind his waiver because he did not understand the rights he had waived. The trial court observed that:

> [t]he record should reflect that I observed a conversation between attorney and client after the two defense witnesses testified which appeared to be a conversation concerning the defendant's previously made decision not to testify . . . . I need to confirm . . . that this is indeed what was occurring during that very brief off the record consultation between you and Mr. Arredondo before you rested your case. Is that correct?

Arredondo's attorney confirmed that, after the last defense witness had testified, he asked Arredondo if he still wanted to waive his right to testify. According to the attorney, Arredondo said: "I don't want to testify." The attorney also assured the trial court that he had explained the right to testify to Arredondo several times before and during the trial. The trial court concluded that Arredondo "made a knowing and voluntary and irrevocable decision not to testify in this case."

¶ 15. The next morning, before the case was given to the jury, Arredondo's attorney again told the court that he had conferred with Arredondo and confirmed that Arredondo did not want to testify. The trial court

386

reaffirmed that Arredondo's waiver of his right to testify was knowing and voluntary:

> I think the record should be very clear, to the extent it wasn't made clear yesterday, that I regard Mr. Arredondo's conduct yesterday afternoon on this issue of whether to testify or not to testify simply [as] another attempt to manipulate rather than any change of heart or any misunderstanding.

> There is no support for your claim, Mr. Arredondo, that you misunderstood, and there is no support for your claim that you were doing what your attorney told you and not what you wanted to do. The record fully supports my conclusions in this regard. You told me directly and in an unequivocal fashion that you did not wish to testify.

> . . . .

> The defendant was fully advised of his rights in this regard both by me and by his counsel. He was advised of the same rights in [a] prior trial . . . . He represented in the prior trial a full understanding of his rights to testify or not to testify in that matter. His attorney represented on the record in that matter that he fully understood his rights and options in that regard, and I am fully satisfied that the defendant understands what the situation was [and] made an informed, knowing and voluntary decision.

¶ 16. At the *Machner* hearing, Arredondo's attorney testified that Arredondo never told him before the defense rested that he wanted to testify. In contrast, Arredondo claimed that he told his attorney that he had to testify to prove his innocence. The postconviction court adopted the State's proposed finding that Arredondo told his attorney after the defense witnesses had testified that he still did not want to testify.

387

¶ 17. The determination of witness credibility is left to the trial court, *Dejmal v. Merta*, 95 Wis. 2d 141, 151–152, 289 N.W.2d 813, 818 (1980), and Arredondo has not shown that the trial court's findings are clearly erroneous. Under the facts here, a second on-the-record colloquy with Arredondo was not required. Based on the trial court's findings of fact, Arredondo knowingly and voluntarily waived his right to testify.

¶ 18. Second, Arredondo alleges that the trial court erroneously exercised its discretion when it refused to reopen the evidence to allow him to testify. Included in this allegation is his claim that the trial court misinterpreted the law when it concluded that Arredondo's waiver of his right to testify was "irrevocable." Again, we disagree.

¶ 19. "The right to testify must be exercised at the evidence-taking stage of trial." *United States v. Jones*, 880 F.2d 55, 59 (8th Cir. 1989). "Once the evidence has been closed, whether to reopen for submission of additional testimony is a matter left to the trial court's discretion." *Ibid.* A trial court must consider "whether the likely value of the defendant's testimony outweighs the potential for disruption or prejudice in the proceedings, and if so whether the defendant has a reasonable excuse for failing to present the testimony during his case-in-chief." *United States v. Peterson*, 233 F.3d 101, 106 (1st Cir. 2000).

¶ 20. In this case, the trial court considered the potential for prejudice. Arredondo made his request after the trial court told the jury that the evidence-taking stage of the trial was complete, and after the State dismissed its rebuttal witnesses. The trial court

determined that "substantial prejudice . . . would exist to the state and the system and the sequestered jury in order to reopen the case at this time." As noted, the trial court also found that Arredondo voluntarily gave up his right to testify. Moreover, the trial court found that Arredondo was engaging in "theatrics and . . . playing for the cameras, perhaps, and that this is a gross attempt to manipulate the system."[2]

¶ 21. "[T]he need for order and fairness in criminal trials is sufficient to justify firm, though not always inflexible, rules limiting the right to testify." *Jones*, 880 F.2d at 59. Under the circumstances, we see no infringement of Arredondo's constitutional right to testify. Further, it is clear from the context of the trial court's statements that the trial court did not mean that Arredondo's decision to waive his right to testify was irrevocable as a matter of law. Rather, it determined that it should not re-open based on what it believed was Arredondo's "attempt to manipulate the system." The trial court did not erroneously exercise its discretion in not re-opening the evidence.

*B. Ineffective Assistance of Trial Counsel*

¶ 22. Arredondo also contends that his trial lawyer was ineffective. His challenges fit into three main

---

[2] Arredondo did not present any evidence from which the trial court could evaluate the likely value of his testimony. He simply told the court that he wanted to testify because "the only one that can defend David Arredondo is David Arredondo." We presume that the trial court determined that Arredondo did not adequately explain what he would have said if allowed to testify. *See State v. Echols*, 175 Wis. 2d 653, 673, 499 N.W.2d 631, 636 (1993) (generally, when a trial court fails to make an express finding to support its conclusion, we may assume the trial court made the finding in a way that supports its decision).

categories, and we will discuss each category. Any sub-issue mentioned by Arredondo in his briefs and not discussed in this opinion was inadequately briefed. *See State v. Waste Mgmt. of Wis., Inc.*, 81 Wis. 2d 555, 564, 261 N.W.2d 147, 151 (1978) ("An appellate court is not a performing bear, required to dance to each and every tune played on an appeal."); *State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633, 642 (Ct. App. 1992) (appellate court may "decline to review issues inadequately briefed").

¶ 23. Arredondo's ineffective-assistance claims overlap his claim that the postconviction court's findings of fact on his ineffective-assistance-of-counsel claims were clearly erroneous and unsupported by either the law or the record. For the reasons discussed below, there is no merit to Arredondo's ineffective-assistance-of-counsel claims. Thus, the postconviction court did not err when it denied his postconviction motion.

¶ 24. In order to establish ineffective assistance of counsel, a defendant must prove: (1) deficient performance; and (2) prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove deficient performance, a defendant must show specific acts or omissions of counsel that are "outside the wide range of professionally competent assistance." *Id.*, 466 U.S. at 690. There is a "strong presumption that counsel acted reasonably within professional norms." *State v. Johnson*, 153 Wis. 2d 121, 127, 449 N.W.2d 845, 848 (1990).

¶ 25. To prove prejudice, a defendant must show that the lawyer's errors were so serious that the defendant was deprived of a fair trial and a reliable outcome. *Strickland*, 466 U.S. at 687. In order to succeed, "[t]he

defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, 466 U.S. at 694.

¶ 26. Our standard for reviewing an ineffective-assistance-of-counsel claim involves mixed questions of law and fact. *Johnson*, 153 Wis. 2d at 127, 449 N.W.2d at 848. Findings of fact will not be disturbed unless clearly erroneous. *Ibid.* Legal conclusions, however, as to whether counsel's performance was deficient and prejudicial, present questions of law. *Id.*, 153 Wis. 2d at 128, 449 N.W.2d at 848. Finally, we need not address both *Strickland* prongs if the defendant fails to make a sufficient showing on either one. *Strickland*, 466 U.S. at 697.

1. Right to Testify

¶ 27. Arredondo argues that his trial lawyer was ineffective for advising him not to testify. We disagree. At the *Machner* hearing, Arredondo's attorney testified that he advised Arredondo not to testify for two main, albeit related, reasons. First, the lawyer testified that he believed Arredondo would make a poor witness because Arredondo told him inconsistent details about the night Klamann was killed, and that he would be discredited on cross-examination because he told the police inconsistent things. Second, Arredondo's attorney testified that if Arredondo testified he believed that an incriminating statement Arredondo gave to a detective that had been suppressed prior to trial would have been admissible to impeach Arredondo. *See Harris v.*

391

*New York*, 401 U.S. 222, 225–226 (1971) (statements obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), can be used for impeachment purposes). This strategy was professionally reasonable. *See State v. Felton*, 110 Wis. 2d 485, 502–503, 329 N.W.2d 161, 169 (1983) (we will uphold counsel's strategic decision if it was rationally based on the facts of the case and the law).

¶ 28. Arredondo also contends that his trial lawyer did not represent him effectively during his attempt to revoke his decision not to testify. Arredondo alleges that his attorney's performance was deficient because his attorney failed to: confirm with him that he did not want to testify; assert Arredondo's alleged right to a second on-the-record colloquy; and advocate for his right to testify. We disagree.

¶ 29. The record shows that Arredondo's attorney properly responded to Arredondo's attempted revocation. First, as noted, both the trial court and the postconviction court found that before Arredondo's attorney rested he confirmed with Arredondo that Arredondo did not want to testify. Second, the failure of Arredondo's lawyer to seek a second on-the-record colloquy was not prejudicial under *Strickland* because a second colloquy was not required. Finally, the trial court found that Arredondo's belated desire to testify was an attempt to manipulate the system—that Arredondo lied to the court when he told it that he did not understand his right to testify. Arredondo's attorney was not required to help Arredondo pursue that "strategy." *See Nix v. Whiteside*, 475 U.S. 157, 168–169 (1986) (attorney's duty to prevent fraud upon the court).

## 2. Defense Strategy

¶ 30. Arredondo also makes a series of claims that challenge his trial lawyer's defense strategy. First, he contends that his trial lawyer was ineffective because he failed to investigate, present, and argue his "only meritorious defense," which, he claims, was that Garza, Arredondo's roommate, murdered Klamann. At the *Machner* hearing, Arredondo's attorney testified that he chose not to argue that Garza was the only person who could have killed Klamann because there was no direct evidence linking Garza to the murder. Instead, he claimed that his trial strategy was to show that someone other than Arredondo killed Klamann:

> The defense strategy in a nutshell was that Mr. Arredondo was at the Cinco de Mayo Festival on the south side that year. He had met Ms. Klamann at the festival. They had apparently become friendly. If I recall right, they left the festival together. I believe it was in a cab, and I think they stopped at — it was at his mother's or a friend's or relative's or something.
>
> There wasn't a dispute that they were together. They actually wound up at his place. They had consensual sex. They had consensual sex, and he had then left. They had consensual, rough sex, that was the distinction, rough sex. He had then left after Thomas Garza gave him some money to go out and get some drugs or something like that.

¶ 31. A trial attorney may select a particular defense from the available alternative defenses. *Felton*, 110 Wis. 2d at 501–502, 329 N.W.2d at 169. We will uphold the strategic decision, even if it appears in hindsight that another defense would have been more

393

effective, as long as the decision is rationally based on the facts of the case and the applicable law. *Id.*, 110 Wis. 2d at 502–503, 329 N.W.2d at 169.

¶ 32. It was reasonable for Arredondo's attorney to present the general defense that a third person could have killed Klamann. There was little, if any, evidence linking Garza to the crime. Thus, it is unlikely that a jury would have found that Garza committed it. Under the theory of defense advanced by Arredondo's lawyer, however, the jury was free to reject the theory that Garza did it, but could still have found that someone other than Arredondo was responsible for the murder. The fact that this strategy failed does not make the attorney's representation deficient. *See State v. Koller*, 87 Wis. 2d 253, 264, 274 N.W.2d 651, 657 (1979).

¶ 33. Second, Arredondo claims that his trial attorney failed to impeach Garza's testimony with false statements Garza made to the police. This claim fails on both the deficiency and prejudice prongs. Arredondo cannot show prejudice because Garza admitted on direct-examination that he lied to the police:

> Q. Mr. Garza, when the police first talked to you about this you did not tell them the truth; is that correct?
>
> A. When they first approached me it was on, it was on a Friday night. At that point I did not know who they were looking for. They did not tell me they were looking for David. They just showed me some pictures and I did not recognize him from those pictures. They asked me if I had a roommate and knowing in the past police were harassing David and I because we are roommates, . . . I didn't think that he was related to that person that they found, the victim, so I told them that I didn't have no [*sic*] roommate.
>
> Q. *So you lied to the police?*

A. *Yes.*

Q. You're also trying to protect him?

A. I had a false sense of family loyalty. His mother is the Godmother to my sister and I always try to help his mother in every way I can.

(Emphasis added.)

¶ 34. Moreover, Arredondo's attorney adequately cross-examined Garza:

Q. Do you recall speaking to — Do you recall speaking to Detective[s] Gary Schuster and William Jessup on May 9, 1997? Those are the first detectives that made contact with you?

A. Yes.

Q. You told them, it's your testimony today you say that you just didn't recognize David's picture; correct?

A. Right.

Arredondo's attorney also cross-examined Garza about Garza's statement to the police that he heard a woman ask "where is my money, where is my money," after which he heard Arredondo say "shhh." Garza admitted that he was not "100 percent" sure where the woman's voice was coming from, but that he did hear something. The jury was well aware that Garza lied to the police.

¶ 35. Third, Arredondo alleges that his attorney failed to locate and present the testimony of Joe Quiles, an alleged alibi witness. Arredondo claims that Quiles would have testified that he saw Arredondo alone at Angelo's Tavern around 9:00 or 10:00 p.m. on May 4, 1997. He contends that this testimony would have bolstered his defense that Klamann was alive when he left his apartment. Again, we disagree.

395

¶ 36. At the *Machner* hearing, Arredondo's attorney testified that he did not call Quiles to testify at trial because his personal investigator could not locate him. Arredondo alleges that this claim is belied by a postconviction proffer of testimony from his brother, Raymond Arredondo. We disagree. Raymond Arredondo's proffer provides, as relevant:

> Prior to trial, Ray Arredondo talked to Joe Quilles [*sic*] and told him that David's trial attorney or investigator would be contacting him about his testimony because Mr. Quilles [*sic*] was at Angelo's with David Arredondo at about 9:00 or 10:00 o'clock on the evening of May 4, 1997.

Arredondo points us to nothing in the record that enables us to conclude that Quiles was capable of being produced. The proffer does not state that Raymond Arredondo told his brother's attorney or the investigator where Quiles lived or where he could be found. Without more, the proffer is insufficient to overcome the strong presumption that Arredondo's counsel acted reasonably.

¶ 37. Fourth, Arredondo alleges that his trial lawyer was ineffective because he did not cross-examine Arredondo's former cellmate, Kurt Moederndorfer, on the full extent of the consideration he received for testifying at Arredondo's trial. This claim also lacks merit.

¶ 38. In an unrelated case, Moederndorfer pled guilty to possession of marijuana with the intent to deliver. On direct-examination in this case, Moederndorfer testified that the State dropped an habitual criminal penalty enhancer from the marijuana charge and told the sentencing judge about Moederndorfer's

cooperation in this case. According to Moederndorfer, the trial court in his case sentenced him to nineteen months in prison on the marijuana charge, concurrent to a parole violation. Moederndorfer thus told the jury that he received consideration for his testimony. There was no need for Arredondo's trial lawyer to elicit this information again on cross-examination and Arredondo was not prejudiced by his failure to do so.

¶ 39.	Arredondo also claims that his trial lawyer should have impeached Moederndorfer about a sentence-modification motion Moederndorfer filed several months after Arredondo's trial, which claimed that Moederndorfer's safety in prison was jeopardized by his testimony. This claim also lacks merit because Arredondo does not explain how his attorney could have cross-examined Moederndorfer about something that had not yet happened.

¶ 40.	Arredondo further alleges that his attorney failed to investigate parole-revocation proceedings, which would have revealed that Moederndorfer allegedly lied to Moederndorfer's parole agent concerning some matter other than the facts of this case. He claims that his attorney should have used the testimony of Moederndorfer's parole agent to impeach Moederndorfer's character for truthfulness. Arredondo does not elaborate, however, on what the parole agent would have said if called to testify. When a defendant claims that trial counsel was deficient for failing to present testimony, the defendant must allege with specificity what the particular witness would have said if called to testify. *See State v. Flynn*, 190 Wis. 2d 31, 48, 527 N.W.2d 343, 349–350 (Ct. App. 1994). Arredondo has failed to provide the requisite specificity.

¶ 41. Fifth, Arredondo claims that his trial lawyer "acquiesced" to allegedly inculpatory testimony of a forensic odontologist, who testified about bite marks on Klamann. Again, we disagree. At trial, Lowell T. Johnson, M.D., testified that human bite marks on Klamann's breast were consistent with Arredondo's bite mark. He opined that the bite marks occurred "at or near the time of death, but there is no way to specifically put a matter of time frame on it."

¶ 42. Arredondo contends that this testimony was inconsistent with his defense because it implied that he was with Klamann when she died. The record shows, however, that Arredondo's attorney did not "acquiesce" to this testimony as Arredondo suggests. On cross-examination, Arredondo's attorney elicited from Dr. Johnson that he could not "put a time frame" on the bite marks:

Q. Thank you, doctor. Can you give a reasonable opinion . . . [on] what you feel would be a reasonable range of hours for the perimortem marks here?

A. No, sir.

Q. Would they have been as much as an hour before death?

A. There is no way of telling clinically that I'm aware of, counselor, to put a time frame on it. Even from the histological thing, I think the pathologists will tell you that they may be able to give you a little closer approximation, but even then, it's an approximation, and I don't know there is any way of ascertaining exactly the time that it occurred.

¶ 43. Arredondo claims that his attorney's cross-examination of Dr. Johnson was insufficient, however, because the attorney did not cross-examine Dr. Johnson

398

with the allegedly inconsistent testimony of Virginia J. Greenbaum, a medical examiner. At trial, Dr. Greenbaum testified that it was "very difficult to tell" if all of Klamann's injuries had occurred before Klamann died. She agreed with the prosecutor that Klamann's injuries occurred before or around the time Klamann died. Based on this testimony, Arredondo's attorney was not ineffective for failing to impeach Dr. Johnson with Dr. Greenbaum's opinions. Her testimony about the timing of the injuries, including the bite marks, was consistent with Dr. Johnson's testimony that he could not specifically tell when the bite marks were made.

¶ 44. Arredondo also claims that his attorney should have objected to Dr. Johnson's testimony because the attorney was "surprised" by it. Arredondo does not point us to any evidence, however, to show that his trial attorney was unaware that Dr. Johnson was going to testify or what he was going to testify about. Indeed, Arredondo's attorney effectively cross-examined Dr. Johnson about the bite marks. There is no indication that Arredondo's attorney was surprised by Dr. Johnson's testimony.

3. Other-Acts Evidence

¶ 45. At Arredondo's trial, Kim S. testified about Arredondo's alleged sexual assault of her in 1995. Arredondo was tried and acquitted on that charge in 1996. At Arredondo's homicide trial, Kim S. testified that on June 15, 1995, Arredondo and Peter Cefalu came to her apartment after she had a fight with her boyfriend, Matthew Ade. According to Kim S., Arredondo knocked her down after Cefalu left, choked her, and threatened her with a knife. She testified that

Arredondo then forced her to go into her bedroom where he sexually assaulted her.

¶ 46. Arredondo contends that his attorney should have called Cefalu and Ade, both of whom testified at the sexual-assault trial, to testify in this case. He alleges that their testimony would have impeached Kim S.'s testimony that Arredondo assaulted her. Arredondo was not prejudiced by his attorney's failure to present this testimony.

¶ 47. The transcript of the sexual-assault trial is in the record on this appeal. Cefalu was Arredondo's roommate and lived in the same building as Kim S. when Arredondo allegedly sexually assaulted her. He testified that around 2:30 a.m. he saw a group of men with Kim S. in the parking lot of the building. According to Cefalu, one of the men from the parking lot knocked on his apartment door around 4:00 or 4:30 a.m. Cefalu testified that the man told him that:

> they were up there having a beer, drinking or whatever, and some fight ensued and he said, you know, he was pretty drunk, it was hard for me to really understand what he was saying, but he said something to the effect like, well, this is real sick what happened and she's got her top ripped open and he said you know Matt fights with his girlfriend but it's never like this, something to that effect, and I said, you know, hey, I didn't have anything to do with this, I wasn't up there.

Ade testified that he got into a fight with Kim S. and left her at a bar. When he went to her apartment later that night, he found Kim S. with Arredondo and a man whom he thought was "Peter." Ade testified that he argued with Kim S. and left to go out with friends. According to Ade, Kim S. called him a few hours later and he went over to her apartment. When he arrived, Kim S. told him that Arredondo assaulted her.

¶ 48. One of the prerequisites to the admission of other-acts evidence is that a reasonable jury could find by a preponderance of the evidence that the defendant committed the other act. *State v. Landrum*, 191 Wis. 2d 107, 117, 528 N.W.2d 36, 41 (Ct. App. 1995).[3] Here, despite the prior acquittal, a jury could reasonably conclude by a preponderance of the evidence that Arredondo sexually assaulted Kim S. based on Kim S.'s testimony. There is nothing in either Cefalu's or Ade's testimony that would have directly impeached Kim S.'s version of the sexual assault. Accordingly, Arredondo fails to show that but for his counsel's failure to present this testimony, his trial was unfair.

¶ 49. Arredondo further claims that his trial lawyer should have moved to admit pursuant to Wis. Stat. Rule 908.045(1) (declarant unavailable) the transcript of Arredondo's testimony at the 1995 sexual-assault trial. Arredondo contends that the trial court would have been "required" to admit his prior testimony because the other-acts evidence placed him in the "constitutionally untenable" position of either testifying in the homicide trial about the Kim S. assault and opening himself to cross-examination or foregoing the opportunity to rebut Kim S.'s testimony. We disagree. The criminal process is replete with situations requiring " 'the making of difficult judgments' " concerning tensions between constitutional rights. *State v. Hall,*

---

[3] Arredondo does not argue that his trial lawyer was ineffective in connection with any of the other factors that a trial court must consider before admitting evidence of other acts. *See* Wis. Stat. Rule 904.04(2); *State v. Sullivan*, 216 Wis. 2d 768, 772–773, 576 N.W.2d 30, 32–33 (1998).

103 Wis. 2d 125, 148, 307 N.W.2d 289, 299–300 (1981) (quoted source omitted). It is not unconstitutional to require a defendant to choose between testifying or remaining silent even though that choice affects other criminal charges. *See ibid.* Arredondo has failed to prove that his trial lawyer provided ineffective assistance.[4]

*C. Postconviction Evidence*

¶ 50. Next, Arredondo alleges that the postconviction court erroneously exercised its discretion when it "refus[ed] to admit or consider" the testimony of Arredondo's witnesses at the *Machner* hearing. We disagree. While the postconviction court purported to limit the evidence Arredondo could present at the *Machner* hearing, it actually accepted and considered all written submissions from the parties, including Arredondo's witness affidavits and proffers of testimony. " 'A circuit court has broad discretion in determining the relevance and admissibility of proffered evidence.' " *State v. Oberlander*, 149 Wis. 2d 132, 140, 438 N.W.2d 580, 583 (1989) (quoted source omitted). Arredondo does not show how the court erroneously exercised its discretion. *See, e.g., United States v. Delker*, 757 F.2d 1390, 1396 (3d Cir. 1985) (court has discretion to accept evidence by live testimony or proffer at bail hearing).

---

[4] Arredondo also argues that he was prejudiced by the aggregate of his trial attorney's alleged errors. As noted, Arredondo's ineffective-assistance claims fail on the merits. That ends our inquiry. *See State v. Thiel*, 2003 WI 111, ¶ 61, 264 Wis. 2d 571, 606, 665 N.W.2d 305, 322–323 ("each act or omission must fall below an objective standard of reasonableness . . . in order to be included in the calculus for prejudice").

*D. Sentencing*

¶ 51. Arredondo also argues that the sentencing court improperly considered his alleged sexual assault of Kim S. We disagree.

¶ 52. Sentencing is vested in the trial court's discretion, and a defendant who challenges a sentence has the burden to show that it was unreasonable; it is presumed that the trial court acted reasonably. *State v. Lechner*, 217 Wis. 2d 392, 418, 576 N.W.2d 912, 925 (1998). There is "a 'strong public policy against inter-ference with the sentencing discretion of the trial court and sentences are afforded the presumption that the trial court acted reasonably.' " *State v. Echols*, 175 Wis. 2d 653, 681–682, 499 N.W.2d 631, 640 (1993) (quoted source omitted).

¶ 53. The three primary factors a sentencing court must consider are the gravity of the offense, the character of the defendant, and the need to protect the public. *State v. Harris*, 119 Wis. 2d 612, 623, 350 N.W.2d 633, 639 (1984). Here, the trial court considered Kim S.'s testimony about the alleged sexual assault:

> As far as [your] background is concerned, Mr. Arredondo . . . there is the sexual assault matter that I have already made reference to involving Kim S[.] that you stood trial on before me in that case some two years ago and were acquitted. And *as I've already indicated, that verdict must be accepted* but that does not compel me to agree with it. And I think it is absolutely fair for me to consider what I heard in that case which was repeated in this case when Ms. S[.] was given permis-sion to testify as a victim of a prior act on your part as

being relevant to it. She went through her pain as well, and I think it is fair for me to consider that as well.

(Emphasis added.) Arredondo claims that the trial court improperly considered the sexual-assault evidence because it "simply replac[ed] the jury's acquittal conclusion with its own." This argument ignores the well-recognized distinction between the fact-finder's function at the guilt stage, where the fact-finder must determine whether the government has proved a defendant's guilt beyond a reasonable doubt, and the sentencing judge's role, which is to assess the defendant's character using all available information, unconstrained by the rules of evidence that govern the guilt-phase of a criminal proceeding. *See Williams v. New York*, 337 U.S. 241, 246–247 (1949) (evidentiary rules that limit what a jury may consider in determining whether the government has proven a defendant guilty beyond a reasonable doubt do not so circumscribe a sentencing court).

¶ 54. It is " 'well established that a sentencing judge may take into account facts introduced at trial relating to other charges, *even ones of which the defendant has been acquitted.*' " *United States v. Watts*, 519 U.S. 148, 152 (1997) (per curiam) (quoted source omitted, emphasis added); *see also State v. Marhal*, 172 Wis. 2d 491, 501–503, 493 N.W.2d 758, 763–764 (Ct. App. 1992) ("Information upon which a trial court bases a sentencing-decision, as opposed to a finding of guilt, need not, of course, be established beyond a reasonable doubt." Thus, "a sentencing court may consider conduct for which the defendant has been acquitted."); *State v.*

*Bobbitt*, 178 Wis. 2d 11, 16–18, 503 N.W.2d 11, 14–15 (Ct. App. 1993) (recognizing validity of rule stated in *Marhal*).

¶ 55. As we have seen, the trial court "accepted" the jury's verdict in Arredondo's other case. But it also properly considered the facts underlying that case in gauging Arredondo's character. *See State v. Leitner*, 2001 WI App 172, ¶ 44, 247 Wis. 2d 195, 214, 633 N.W.2d 207, 216, *aff'd*, 2002 WI 77, 253 Wis. 2d 449, 646 N.W.2d 341 (court may consider factual circumstances related to offenses for which the defendant has been acquitted). Simply put, the trial court did not, as the Dissent asserts, " 'replace a jury's conclusion with its own,' " Dissent at ¶ 60 (quoting *Bobbitt*, 178 Wis. 2d at 18, 503 N.W.2d at 15); rather, it properly considered Kim S.'s testimony as it reflected on what kind of a person Arredondo was and is. There was no error.

*E. Interest of Justice*

¶ 56. Finally, Arredondo asks this court to order a new trial in the interest of justice because, he claims, the real controversy was not fully tried. He argues that the cumulative effect of the errors we discussed above support his claim. Since we have rejected all of Arredondo's alleged arguments, we decline to order a new trial. *See Mentek v. State*, 71 Wis. 2d 799, 809, 238 N.W.2d 752, 758 (1976) ("Zero plus zero equals zero.").

*By the Court.*—Judgment and order affirmed.

¶ 57. CURLEY, J. (*concurring in part; dissenting in part*). I concur in the majority's conclusions in all matters except Arredondo's sentencing claim. Although I believe the admission of Kim S.'s testimony as "other

acts" evidence was unwise, as Arredondo had been acquitted for those actions, I recognize that current law permits such a practice. However, I disagree with the majority opinion's holding that the trial court properly considered the allegations of the earlier case at sentencing.

¶ 58. The majority opinion cites *State v. Bobbitt*, 178 Wis. 2d 11, 503 N.W.2d 11 (Ct. App. 1993), and *State v. Leitner*, 2001 WI App 172, 247 Wis. 2d 195, 633 N.W.2d 207, *aff'd*, 2002 WI 77, 253 Wis. 2d 449, 646 N.W.2d 341, as authority for the sentencing court to consider Arredondo's alleged assault of Kim S. in sentencing him in this case. Neither of the cases are factually on point.

¶ 59. In *Leitner*, the question arose as to whether a sentencing court could use earlier expunged convictions when sentencing a defendant for a newly-committed crime and whether all records documenting the behavior underlying an expunged conviction should be destroyed. The supreme court determined that the expungement statute does not require the destruction of the records, and the trial court is free to consider the underlying facts of the expunged conviction at sentencing. 247 Wis. 2d 195, ¶¶ 47, 49.

¶ 60. In *Bobbitt*, the accused was found guilty of robbery and false imprisonment, but acquitted of the charge of attempted first-degree intentional homicide after a jury trial. All three charges involved the same victim, who testified at trial. Despite the acquittal on the one count, at sentencing, the trial court considered the alleged violence associated with the attempted homicide charge as an aggravating circumstance justifying a departure from the sentencing guidelines. The accused appealed, claiming that the acts of violence all dealt with the acquitted charge and, therefore, the trial

court improperly substituted its opinion for that of the jury when it considered the violent acts as a factor at sentencing. This court determined that, under those circumstances, it was proper for the trial court to adopt the victim's version of the events for sentencing purposes, even though the jury did not convict on the third charge. The *Bobbitt* court cautioned, however, that a "court may not sentence according to its desire to replace a jury's conclusion with its own." 178 Wis. 2d at 18. To do so would "offend the fundamental principles of fairness and due process." *Id.*

¶ 61. Here, the trial court, the same court that presided over Arredondo's earlier acquittal, appears to have sentenced Arredondo based on its conclusions regarding the earlier case. The trial court stated:

> And we are all to be thankful to the police department for that work because without that, you would be getting off the hook in this case as I believe you got off the hook unfairly and unjustly in the previous case having to do with Kate [sic] [S.] And I am absolutely convinced that that verdict in that case was wrong. And while we must accept it because it was the result of a proper trial and it was the jury's prerogative to issue that verdict, that does not mean we have to agree with it. And I did not and do not agree with it.

Paying lip service to the prohibition against replacing the jury's decision with its own, the trial court later remarked:

> And as I've already indicated, that verdict must be accepted but that does not compel me to agree with it. And I think it is absolutely fair for me to consider what I'heard in that case which was repeated in this case when Ms. S. was given permission to testify as a victim of a prior act on your part as being relevant to it. She

407

went through her pain as well and I think it is fair for me to consider that as well.

¶ 62. Clearly, the trial court's sentencing comments show that Arredondo was also being sentenced for the earlier charge on which he was acquitted. This is impermissible and "offend[s] the fundamental principles of fairness and due process." *See Bobbitt*, 178 Wis. 2d at 18. Thus, I would remand for resentencing.