**COURT OF APPEALS
DECISION
DATED AND FILED**

**August 18, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP89-CR**

Cir. Ct. No. **2015CF1024**

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT I**

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

BREION SHEQUILLE WOODSON,

    DEFENDANT-APPELLANT.

      APPEAL from a judgment and an order of the circuit court for Milwaukee County: CAROLINA STARK, Judge. *Affirmed*.

      Before Brash, P.J., Dugan and Donald, JJ.

      **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.  Breion Shequille Woodson appeals the judgment of conviction entered after a jury found him guilty of possession of a firearm by a person adjudicated delinquent for an act that would be a felony if committed by an adult and possession with intent to deliver more than forty grams of cocaine, as a party to a crime, as a second and subsequent offense.  Woodson also appeals the order denying his postconviction motion.  He argues that trial counsel was ineffective for failing to request expert discovery and for failing to require the trial court to perform its gatekeeping function over the admission of expert testimony.  In addition, Woodson argues that he is entitled to a new sentencing hearing because the trial court relied upon inaccurate information when imposing his sentence and did not sentence him in an individualized manner.  We disagree and therefore affirm.

## I. BACKGROUND

¶2    The State charged Woodson with one count of possession of a firearm by a person adjudicated delinquent.  The charge was based on video surveillance from an apartment building showing Woodson with what appeared to be a gun with an extended magazine in his pocket.  After a search warrant was executed at his apartment, the State also charged Woodson with possession with intent to deliver more than forty grams of cocaine, as a party to a crime, as a second and subsequent offense.

¶3    During the jury trial, the State presented testimony from Milwaukee Police Officer Gregory Kuspa, one of the initial scene officers.  Kuspa testified that the officers attempted to stop a vehicle for a window tint violation.  After briefly coming to a stop, the vehicle accelerated.  Kuspa explained that he had to jump out of the way to avoid getting hit, and the vehicle ultimately got away.

¶4      According to Kuspa, after the incident, officers returned to the scene and were able to locate a building that had video surveillance cameras. Kuspa told the jury that based on his observation of the video, Woodson was a passenger in the vehicle that got away. The jury reviewed surveillance footage, and Kuspa testified about his observations of the video, namely that an "extended magazine, which is commonly inserted into a firearm, that magazine was extending from a portion of Mr. Woodson's right side of his body." Kuspa also reviewed a still photograph from the video and testified that it "depicts Mr. Woodson, with his back toward the camera and his right side of his body, you can see an extended magazine of a semiautomatic firearm."

¶5      Officer Dean Newport also testified for the State. Newport explained that over the course of his career, he was involved in over a thousand gun cases. Newport testified that he had reviewed the surveillance footage of Woodson and concluded: "Based on my experience, I have also had schooling in characteristics of an armed criminal; upon looking at his right front pants pocket, him being Breion Woodson, it is an extended high capacity magazine for a semiautomatic firearm."

¶6      Special Agent Bodo Gajevic additionally testified that he reviewed the photos captured from the surveillance footage and believed that Woodson had a real firearm.

¶7      The jury found Woodson guilty of both counts.[1] In advance of the sentencing hearing, the State provided the trial court and trial counsel with (1) a

---

[1] Woodson does not challenge his drug conviction on appeal; therefore, we do not discuss it in detail.

video recording of the area of 32nd Street and Auer Avenue in Milwaukee, and (2) a "Risk Assessment" from the Milwaukee Police Department Intelligence Fusion Center, regarding Woodson's criminal contacts. The State argued that the video was a "glimpse of what 32nd and Auer is like when no one's watching." The video depicted children in the presence of adults who were flashing money, guns, and drugs.

¶8      Trial counsel objected to the video, which was taken months before Woodson was convicted of the underlying charges in this case, arguing that it was not related to Woodson's crimes. The trial court overruled the objection, finding as follows: "[T]his video is appropriate for a sentencing consideration. I think it speaks directly to the character of the defendant and the need to protect the community" and "the analysis the court will have to engage in regarding the need to protect the community in general from the types of crimes for which [Woodson's] been convicted[.]"

¶9      After the video was played, the trial court identified Woodson in the video: "So at 3 minutes and 27 seconds ... that depicts a man sitting in the front passenger seat of a car, that that man the court identifies or recognizes as Mr. Woodson." The State confirmed that it was "definitely Mr. Woodson." The defense did not take a position as to whether Woodson appeared in the video, stating: "We're not taking no position on it, who's in it and why they're in it or anything else about the video."

¶10     To arrive at its sentence, the trial court considered the severity of the offense and the need to protect the community. The trial court also referenced a dismissed bribery charge detailed in the Risk Assessment, where Woodson

allegedly offered a police officer "thousands of dollars to just let [him] go and …
look the other way."

¶11    The trial court reflected on Woodson's character, stating: "I broke
down in tears, because it is so sad" and "so heartbreaking that children, no one
stopped in this video. You didn't stop, Mr. Woodson, and say, hey, there are kids
here." The trial court went on to impose concurrent sentences totaling nineteen
years of initial confinement and ten years of extended supervision.

¶12    Woodson subsequently filed a postconviction motion to vacate his
firearm conviction, and he requested a new sentencing hearing. His motion to
vacate the firearm conviction was based on a claim that trial counsel was
ineffective for failing to request expert discovery under WIS. STAT. § 971.23(1)(e)
(2015-16)[2] and for failing to challenge the State's use of expert testimony pursuant
to ***Daubert v. Merrell Dow Pharm., Inc***., 509 U.S. 579 (1993), and WIS. STAT.
§ 907.02(1). His motion for a new sentencing hearing was based on claims that
the trial court relied on inaccurate information when it imposed his sentence—
primarily its identification of him in the video—and punished him for actions
taken by others in the video. Woodson also argued that the trial court improperly
relied on the allegation in the Risk Assessment that Woodson attempted to bribe a
police officer. Woodson denied that allegation.

¶13    Following briefing, the trial court denied Woodson's postconviction
motion. It determined that the law enforcement witnesses who testified on the
issue of whether Woodson possessed a gun provided lay opinions "based upon

---

[2] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise
noted.

their work and life experiences, and common sense." Therefore, the trial court concluded Woodson's trial counsel was not ineffective for not objecting to the testimony and there was no basis for trial counsel to pursue a **Daubert** hearing.

¶14 The trial court further concluded that Woodson's argument that he was sentenced on inaccurate information had no merit. With regard to the identification of Woodson in the video, the trial court explained:

> Having observed the defendant during pretrial hearings and over the course of a four-day jury trial, the court was in an ideal position to identify the defendant in the video, even if the defense would not concede that the person in the car was him. The court did not need to take evidence when the defendant's identity in the video was readily apparent.

The trial court additionally explained that contrary to Woodson's assertions, he was not sentenced based on "guilt by association." Instead, the trial court sentenced Woodson based on "*character* by association." (Emphasis in original.) That is, the trial court "considered the video in its entirety as it reflected on the defendant's character and the kind of lifestyle he was embracing."

¶15 As to Woodson's claim that it was improper for the trial court to consider the allegation in the Risk Assessment that he attempted to bribe a police officer to let him go, the trial court explained that the claim was baseless because it could consider uncharged and unproven allegations.

## II. DISCUSSION

### A. *Woodson's trial counsel was not ineffective.*

¶16 On appeal, Woodson argues "that this was not your typical gun case where the defendant was caught with one on his person or in his vehicle or house." No gun was recovered; instead, the gun possession charge was based on

Woodson's appearance in video surveillance. As previously detailed, the State additionally presented evidence from Officer Kuspa, Officer Newport, and Special Agent Gajevic, who testified that based on their perceptions of the video, Woodson had a real gun in his pocket. Woodson argues that trial counsel was ineffective for not doing the following things: requesting expert reports, statements, summaries, or results under WIS. STAT. § 971.23(1)(e) (2015-16); objecting to this testimony as unnoticed expert testimony; and moving for a *Daubert* hearing.

¶17    A postconviction claim of ineffective assistance of counsel must show that counsel's performance was deficient and also that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To demonstrate deficient performance, the defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* To demonstrate prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. If a defendant fails to satisfy one prong of the ineffective assistance of counsel test, we need not address the other. *Id.* at 697. Counsel's performance is not deficient if there is no objection to an issue that has no merit. *See State v. Wheat*, 2002 WI App 153, ¶14, 256 Wis. 2d 270, 647 N.W.2d 441.

¶18    We review the denial of an ineffective assistance claim as a mixed question of fact and law. *State v. Johnson*, 153 Wis. 2d 121, 127, 449 N.W.2d 845 (1990). We will not reverse the trial court's factual findings unless they are clearly erroneous. *Id.* However, we review the two-pronged determination of trial counsel's performance independently as a question of law. *Id.* at 128.

¶19     Woodson's ineffective assistance claim is predicated on whether the law enforcement witnesses' testimony qualified as lay opinion testimony under WIS. STAT. § 907.01 or expert testimony under WIS. STAT. § 907.02.  He contends that Officer Kuspa, Officer Newport, and Special Agent Gajevic testified based solely on their training and experience, and, therefore, they provided their expert opinions.[3]  We disagree.

¶20     The reasoning set forth in ***State v. Small***, 2013 WI App 117, ¶¶13-15, 351 Wis. 2d 46, 839 N.W.2d 160, guides our analysis.  In that case, a police officer testified as to what the officer heard the defendant saying on a surveillance video of a robbery.  ***Id.***, ¶13.  Small argued that the testimony was not admissible

---

[3] WISCONSIN STATS. §§ 907.01 and 907.02 provide, in relevant part:

**907.01 Opinion by lay witnesses.**  If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are all of the following:

**(1)** Rationally based on the perception of the witness.

**(2)** Helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

**(3)** Not based on scientific, technical, or other specialized knowledge within the scope of a witness under s. 907.02(1).

**907.02 Testimony by experts.**

**(1)** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.

because the officer was not qualified to offer expert testimony regarding his perceptions of what was said. *Id.* We rejected this challenge, explaining that the testimony amounted to a lay opinion based on the witness's perception, which was permissible under WIS. STAT. § 907.01:

> Absent the use of specialized scientific or technical equipment to analyze the audio, the officer was able to give his lay opinion as to what Small said because expert opinion is not needed if the matter is within the ken of the general population. Thus, in *United States v. Begay*, 42 F.3d 486, 502-503 (9th Cir. 1994), ... a law[ ]enforcement officer was permitted to give his lay opinion under Rule 701 of the Federal Rules of Evidence as to what a video showed when an enhanced version was played for the jury at a slow speed, when the officer viewed the video more than "100 times" and closely studied some "800 photographs" of incidents recorded by the video, even though he was not at the events recorded or photographed.… The jurors here heard the audio as well as the co-owner's testimony of what Small said, and were thus able to use their own life experiences in assessing whether [the officer]'s opinion was accurate. This is in contrast to those situations where expert opinion is needed, because in those cases jurors have no independent life experiences on which to rely but must rather referee the battle of experts presented by the parties.

*Small*, 351 Wis. 2d 46, ¶15 (internal citations omitted).

¶21    Here, the trial court similarly concluded that the law enforcement witnesses' testimony amounted to lay opinions and adopted the State's analysis on this point:

> Law enforcement testimony about their perceptions from the video that the defendant had a real handgun in his pocket was lay, not expert, opinion. The officers/detective utilized their own work and life experiences, common sense, and common knowledge to analyze, with the naked eye, what was already observable and viewable in the video. They conducted the same analysis with the still photographs from the video. Their opinions that the defendant possessed a real firearm were based upon a

9

common sense, work experience analysis that clearly qualifies as lay opinion under the law.

> What further supports that this was lay, not expert, opinion, is the fact that police did not have to use any scientific methods, any manipulations of data, or any other methods or instruments to opine to their beliefs that the defendant possessed a real firearm. The law supports a lay opinion conclusion, as officers routinely gain specific knowledge through the course of their careers about firearms, and their testimony, which could be easily anticipated, naturally did assist a jury in determining what they are looking at when viewing the video and determining for themselves whether the defendant possessed a firearm. It is clearly within a lay context that an officer/detective, who carries a firearm daily at work, and who encounters firearms while at work, would have a basic knowledge about types of firearms and how to identify different types of firearm components, and that the same officer/detective would have an understanding of the shapes firearms and magazines have while in someone's pocket. It is well within an officer's lay opinion to be able to testify about magazines and fake versus real firearms. None of these testimonies required more than life experience to opine in those beliefs.

We, too, adopt this detailed analysis. *See* WIS. CT. APP. IOP(5)(a) (Nov. 30, 2009) ("When the trial court's decision was based upon a written opinion ... of its grounds for decision that adequately express the panel's view of the law, the panel may incorporate the trial court's opinion or statement of grounds, or make reference thereto[.]"). Like the trial court, we further note that the jurors had the opportunity to view the video and photographs for themselves and to determine the weight to give to the lay opinions provided and the credibility of the law enforcement witnesses.

¶22 Because the law enforcement witnesses' testimony was properly admitted as lay opinion testimony, Woodson has not shown that his trial counsel performed deficiently by not requesting expert reports, statements, summaries, or

results under WIS. STAT. § 971.23(1)(e) (2015-16); objecting to this testimony as unnoticed expert testimony; and moving for a ***Daubert*** hearing.

B. *Woodson is not entitled to resentencing.*

¶23     Next, Woodson argues that he is entitled to resentencing because the trial court relied on inaccurate information and did not sentence him in an individualized manner.  First, he claims that that the trial court violated his right to due process when it relied on a video that the State presented to it in advance of sentencing.  According to Woodson, the trial court sentenced him based on "guilt by association" after viewing the actions of other people depicted on the video.  Now, for the first time on appeal, Woodson expressly denies that he was one of the individuals depicted in the video.  He argues that he "must not serve a sentence based on the sins of his alleged neighborhood or the larger Milwaukee inner-city community."

¶24     Woodson additionally challenges the trial court's reliance on the Risk Assessment provided to it by the State, which he describes as "a compilation of hearsay-filled police reports to which no witness testified concerning the accuracy of its contents."  Woodson specifically denies the allegation in the Risk Assessment that he attempted to bribe a police officer.

¶25     "A defendant has a constitutional due process right to be sentenced upon accurate information."  ***State v. Coffee***, 2020 WI 1, ¶2, 389 Wis. 2d 627, 937 N.W.2d 579.  The applicable standards, as summed up by our supreme court, are as follows:

> A defendant who was sentenced based on inaccurate information may request resentencing. [***State v.*** ***Tiepelman***, [2006 WI 66, ¶26,] 291 Wis. 2d 179, [] 717 N.W.2d 1.  The defendant *must show by clear and*

> *convincing evidence* that: (1) some information at the original sentencing was inaccurate, and (2) the [trial] court actually relied on the inaccurate information at sentencing. *Id.*; [*State v.*] *Travis*, [2013 WI 38, ¶22,] 347 Wis. 2d 142, [] 832 N.W.2d 491. A [trial] court actually relies on incorrect information when it gives "'explicit attention' or 'specific consideration' to it, so that the misinformation 'formed part of the basis for the sentence.'" *Tiepelman*, 291 Wis. 2d 179, ¶14…. If the defendant meets this burden, then the burden shifts to the State to prove beyond a reasonable doubt that the error was harmless. *Travis*, 347 Wis. 2d 142, ¶86…. If the State fails to meet this burden, then the defendant is entitled to resentencing. If the State meets this burden, then the sentence remains undisturbed.

*Coffee*, 389 Wis. 2d 627, ¶38 (emphasis added).

¶26 Whether Woodson was denied his constitutionally protected due process right to be sentenced upon accurate information is an issue that we independently review. *See Tiepelman*, 291 Wis. 2d 179, ¶9.

¶27 Woodson argues that his "purported connection" to both the video and the alleged bribery incident in the Risk Assessment were inaccurate; however, he has not proved this by clear and convincing evidence. Therefore, this claim fails at the outset. *See Travis*, 347 Wis. 2d 142, ¶22 ("Proving that information is inaccurate is a threshold question.").

¶28 With respect to the video, the trial court noted that "[h]aving observed [Woodson] during pretrial hearings and over the course of a four-day jury trial, the [trial] court was in an ideal position to identify the defendant in the video, even if the defense would not concede that the person in the car was him." Woodson's argument that this was an improper basis for judicial notice of his identity fails because the rules of evidence do not apply at sentencing hearings. *See* WIS. STAT. § 911.01(4)(c) (specifying that the rules of evidence are inapplicable at sentencing); *see also State v. Arredondo*, 2004 WI App 7, ¶53, 269

12

Wis. 2d 369, 674 N.W.2d 647 (explaining that sentencing courts are "unconstrained by the rules of evidence that govern the guilt-phase of a criminal proceeding").

¶29    Woodson goes on to suggest that he was misidentified. He argues that the person that the trial court identified "wore a bandanna, had on large sunglasses, wore a gold grill in his teeth, and had on baggy clothing. This is how many young black men in Milwaukee present themselves … hence the pool of potential candidates for who this person may have been was very large." He additionally submits that the person the trial court identified appeared in the video "for mere seconds" making a reliable identification difficult; that "resemblance and positive identification are two very different things"; and that there are well documented problems with cross-racial identification.

¶30    In the end, however, *suggesting* that Woodson's connection to the video was inaccurate is not the same as *proving*—by clear and convincing evidence—that it was inaccurate. We conclude that the trial court acted within its authority when it identified Woodson as an individual in the video.

¶31    Woodson further contends that he was sentenced based on guilt by association rather than receiving the individualized sentencing to which he is entitled. Woodson contends: "[E]ven if he was one of the people on the video (which again he denies), it was not proper for the court to base any part of his sentence on the actions of anyone else in the video." A review of the sentencing transcript reveals that Woodson received the individualized sentencing to which he is entitled. *See State v. Gallion*, 2004 WI 42, ¶48, 270 Wis. 2d 535, 678 N.W.2d 197 ("Individualized sentencing, after all, has long been a cornerstone to Wisconsin's criminal justice jurisprudence.").

¶32  The trial court reflected on the video insofar as it related to Woodson's character and showed that he was "embracing this lifestyle that creates extreme danger for not only yourself but for other people in our community[.]" The trial court explained that its goals in sentencing Woodson were "first and foremost" to remove him from the community and distance him from the relationships that he was embracing in his lifestyle and to rehabilitate him, which again required distancing from the connections and people that he was "hanging around[.]" There was nothing improper about the trial court's reasoning. In its decision denying Woodson's postconviction motion, the trial court confirmed that it "did not punish the defendant for the conduct of others in the video but rather considered the video in its entirety as it reflected on the defendant's character and the kind of lifestyle he was embracing." *See State v. Fuerst*, 181 Wis. 2d 903, 915, 512 N.W.2d 243 (Ct. App. 1994) (explaining that when a defendant challenges a sentence, the postconviction proceedings afford the trial court an additional opportunity to explain its sentencing rationale).

¶33  Lastly, Woodson argues that it was improper for the trial court at sentencing to consider the allegation in the Risk Assessment that he attempted to bribe a police officer to let him go. Woodson denies this allegation.

¶34  A court, however, may consider uncharged and unproven offenses, even offenses for which the defendant has been acquitted. *State v. Leitner*, 2002 WI 77, ¶45, 253 Wis. 2d 449, 646 N.W.2d 341. Moreover, as noted by the trial court in its decision denying Woodson's postconviction motion, Woodson's "protestations are self-serving[.]"

¶35  Woodson has not shown that he was sentenced on inaccurate information.

14

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.